McCULLOUGH TRANSFER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 55209.    Filed February 25, 1957.

*Donald J. Lynn, Esq.*, and *S. J. Collins, C. P. A.*, for the petitioner.
*Robert E. Johnson, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined deficiencies in income tax liability of the petitioner for the calendar years 1950 and 1951 in the respective amounts of $2,053.57 and $8,080.02.  The question at issue under the pleadings is whether the gains derived by the petitioner upon the sale of certain trailers, trucks, and other motor vehicle equipment constituted ordinary income or capital gains.

### FINDINGS OF FACT.

The petitioner is a corporation organized in 1940 under the laws of the State of Ohio with principal office at Youngstown, Ohio.  Its income tax returns for the years in question were filed with the collector of internal revenue for the eighteenth district of Ohio.

The purposes for which the petitioner was formed, as stated in its amended articles of incorporation, are to engage in the business of transporting property; to acquire, own, lease, operate, and manage vehicles, equipment, and facilities, and other property necessary in the conduct of such business; and to do any and all things incident or necessary thereto. It operates as a common carrier by motor vehicle in interstate and intrastate transportation over certain regular and irregular routes as authorized by certificates of public convenience and necessity issued by the Interstate Commerce Commission and the Public Utilities Commission of Ohio. It operates in the States of Ohio, Pennsylvania, New York, West Virginia, and Michigan.

Prior to 1943 the petitioner had about 100 pieces of rolling equipment. However, in that year it sold all of its rolling equipment and thereafter, including the years 1950 and 1951, did not operate any tractors of its own and did not employ any truck drivers. Instead, it operated through others, commonly known as "brokers," who owned tractors or tractors and trailers. The petitioner charged its customers the authorized tariff and then paid the broker a percentage thereof ranging from 75 per cent to 90 per cent.

Some brokers owned tractors or trucks but did not have money or credit sufficient to purchase trailers. The secretary of the petitioner and his father concluded that the petitioner could increase the volume of its transportation business by purchasing trailers and turning them over to such brokers under an arrangement whereby the brokers could pay off the purchase price over a period. Such an arrangement would also relieve the petitioner of the problem of garage and warehouse space for the equipment and the problem of maintenance. Petitioner was able to buy trailers at a fleet discount amounting to as much as 20 per cent off list price, whereas an individual could not get more than a 10 per cent discount. Petitioner was willing to pass along to the broker some portion of its discount in excess of the discount an individual could obtain, provided the broker would agree to haul freight for the petitioner, and provided petitioner was satisfied that he would so perform as not to cause complaints from petitioner's customers and dispatchers. This plan was put into effect and oral agreements were made with a number of brokers. After discussions with the broker concerning the most profitable type of equipment and the broker's ability to pay, and after agreeing upon the purchase price to be paid by the broker, the petitioner would then order the equipment and turn it over to the broker for use in hauling for the petitioner, retaining title in its own name. Sometimes the broker would not wish to buy a trailer, but would want to convert his tractor into a truck. In such case the petitioner would have the body installed at the factory with the same type of payment arrangement.

The petitioner would allow such broker the same percentage of the tariff received as in the case of other brokers who owned both tractors and trailers and hauled for petitioner. However, on all loads grossing $125 or less to the broker, petitioner withheld the sum of $10 per load, and on all loads grossing over $125 to the broker, petitioner withheld the sum of $15 per load. These withheld sums were credited to the account of the broker upon a deferred credit ledger sheet maintained by the petitioner, and when the aggregate of such credits equaled the agreed purchase price of the trailer, the title to the trailer was transferred to the broker. In this type of transaction the petitioner treated the sale as having occurred on the date of transfer of title to the purchaser. It was agreed that if the broker decided to go out of the trucking business the petitioner would arrange to take back the trailer and refund the broker his equity and cancel the agreement. This was done in some cases. However, the petitioner deducted from the amount refunded an amount sufficient to cover any damages to the trailer caused by the negligence of the broker. In some instances there was conveyed to the broker a different trailer from the one originally contemplated. In each case it was agreed that until title to the equipment passed, the broker should not use the equipment in hauling for others and that doing so would be cause for terminating the agreement, in which case the broker would not be entitled to a refund of any part of the credit. However, the broker was free to use his own tractor in hauling for others.

The petitioner did not sell trailers to the general public but only to those who did hauling for it. In addition to deferred payment transactions as described above the petitioner also sold some trailers, trucks, and cars outright to brokers. In either case, title was first taken by the petitioner. The purchasers continued to furnish transportation for the petitioner during the year in which title was transferred, although there was no agreement with any broker which would prevent his using any of his equipment to which he had title in hauling for others.

Petitioner carried public liability and property insurance on these trailers, as well as cargo insurance, and the premiums were paid by the petitioner both before and after the transfer of title. That continued, as required by law, until the broker terminated his services for the petitioner. All insurance was carried in one insurance policy. Individual insurance policies were not written on each trailer.

In all cases of transportation by others for the petitioner the cabs of the tractors carry a notice, in accordance with the requirements of the Interstate Commerce Commission, showing the petitioner's Interstate Commerce Commission certificate number.

As each trailer or other piece of equipment was purchased by the petitioner, it was entered in the petitioner's books in the fixed asset account showing the cost, and when a deferred payment arrangement was made the credits to the broker were carried as a liability in a suspense account. Until the credits equaled the agreed purchase price the petitioner took depreciation on the equipment and noted it monthly. When the broker's credits equaled the purchase price the depreciation reserve account was closed out, the asset account was closed out, and a profit or loss was set up on the transaction. The profits were entered in the income tax returns as capital gains. The amount of the depreciation sustained on the equipment while title was in petitioner was taken as a deduction in petitioner's income tax returns for the years 1950 and 1951 in the respective amounts of $14,800.19 and $23,721.14. In the deficiency notice no adjustment was made of the depreciation claimed.

If for any reason a broker did not complete the payments for a trailer, and petitioner, in refunding payments previously made by the broker, withheld any amount for negligence or extraordinary wear or tear on a trailer, the amounts so withheld were treated as rent and returned as income in petitioner's income tax returns.

In 1949 the petitioner acquired 7 trailers, in 1950 it acquired 48 trailers (including 3 trailers which were returned) and 1 tractor, and in 1951 it acquired 25 trailers as well as 3 tractors and a Plymouth coupe. Of this equipment the petitioner retained only 2 trailers and either sold the rest outright or entered into deferred payment agreements with brokers as described above. In 1951 there were 4 trailers which had been returned to petitioner which were held in a "pool" for its own use. At the end of 1951 petitioner carried 43 trailers on which it was taking depreciation.

In 1950 the petitioner sold 15 trailers (3 being resales of trailers which had been returned) and 1 tractor, and made installation of parts on 9 tractor-trailer units, realizing a profit of $5,196.82 as set forth on the following page.

| Description | | Alterations | Date acquired | Date sold | Sales price | Depreciation allowed | Cost | Profit (loss) |
| Trailer unit Nos. | Tractor unit No. | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1035A | | | Feb. 28, 1950 | Feb. 28, 1950 | $3,631.36 | | $3,332.39 | $298.97 |
| 1033A | | | Feb. 28, 1950 | Feb. 28, 1950 | 3,405.40 | | 3,215.25 | 190.15 |
| 1037A | | | Feb. 28, 1950 | Feb. 28, 1950 | 3,292.60 | | 3,156.01 | 136.59 |
| 1047A | | | Feb. 28, 1950 | Feb. 28, 1950 | 3,376.03 | | 3,332.39 | 43.64 |
| 1049-1051A | | | Feb. 28, 1950 | Feb. 28, 1950 | 7,389.64 | | 6,996.46 | 393.18 |
| | | 2475 | Mar. 31, 1950 | Mar. 31, 1950 | 671.59 | | 621.59 | 50.00 |
| | | 2996 | Mar. 31, 1950 | Mar. 31, 1950 | 751.91 | | 726.91 | 25.00 |
| 833A | | | Mar. 31, 1950 | Mar. 31, 1950 | 1,100.00 | | 1,000.00 | 100.00 |
| 681A | | | Mar. 31, 1950 | Mar. 31, 1950 | 1,600.00 | | 1,497.44 | 102.56 |
| | | 502 | Mar. 31, 1950 | Mar. 31, 1950 | 519.67 | | 495.07 | 24.60 |
| 1033A | | | Apr. 30, 1950 | Apr. 30, 1950 | 2,605.34 | | 2,758.89 | (153.55) |
| 1035A | | | Apr. 30, 1950 | Apr. 30, 1950 | 2,605.34 | | 2,758.89 | (153.55) |
| 1037A | | | Apr. 30, 1950 | Apr. 30, 1950 | 2,605.34 | | 2,758.89 | (153.55) |
| | | 1 J-4-17 | Apr. 30, 1950 | Apr. 30, 1950 | 3,149.74 | | 2,949.74 | 200.00 |
| 1153-1157A | | | Apr. 30, 1950 | Apr. 30, 1950 | 5,364.23 | | 5,210.68 | 153.55 |
| | | 1076A | May 31, 1950 | May 31, 1950 | 477.53 | | 457.25 | 20.28 |
| | 949-Mack | | May 31, 1950 | May 31, 1950 | 10,618.93 | | 10,184.43 | 434.50 |
| 1222A | | | June 30, 1950 | June 30, 1950 | 3,340.56 | | 2,993.47 | 347.09 |
| 1076A | | | Feb. 9, 1950 | Nov. 30, 1950 | 2,758.89 | $367.57 | 2,205.34 | 921.12 |
| 587A | | | June 1, 1950 | Nov. 21, 1950 | 1,994.13 | 166.69 | 1,200.00 | 960.82 |
| 1014A | | | Jan. 6, 1950 | Nov. 29, 1950 | 3,453.55 | 578.47 | 2,776.60 | 1,255.42 |
| Total | | | | | $64,711.78 | $1,112.73 | $60,627.69 | $5,196.82 |

1 5 units.

Only the last three transactions listed above were under the deferred payment arrangement described hereinabove. (The sale dates shown in those instances are the dates on which the broker completed payment and title was transferred. In each case, except one, the sale date shown is more than 6 months after the date of acquisition by the petitioner.) In all other instances the date of acquisition and the date of sale are shown to be the same, which means that the assets were purchased and sold within the same month and were completed transactions.

In 1951 the petitioner sold 17 trailers, 3 tractors, and 2 Plymouth automobiles at a total profit of $15,596.45 as set forth on the following page.

| Trailer unit Nos. | Tractor unit No. | Plymouth | Date acquired | Date sold | Sales price | Depreciation allowed | Cost | Profit (loss) |
|---|---|---|---|---|---|---|---|---|
| 1085A | | | Feb. 28, 1950 | Mar. 31, 1951 | $2,758.89 | $580.96 | $2,323.86 | $1,015.99 |
| 734A | | | Dec. 28, 1949 | June 30, 1951 | 2,400.00 | 750.04 | 2,000.00 | 1,150.04 |
| 1176A | | | Apr. 6, 1950 | July 31, 1951 | 2,758.89 | 643.23 | 2,205.34 | 1,196.78 |
| 1096A | | 1950 | Feb. 24, 1950 | July 31, 1951 | 2,758.89 | 735.13 | 2,205.34 | 1,288.68 |
| 1047A | | | Aug. 23, 1950 | Sept. 30, 1951 | 1,460.00 | 350.03 | 1,910.51 | (100.48) |
| 1116A | | | Feb. 21, 1950 | Sept. 30, 1951 | 2,758.89 | 827.01 | 2,205.34 | 1,380.56 |
| 1181A | | | Mar. 13, 1950 | Sept. 30, 1951 | 2,758.89 | 783.02 | 2,210.86 | 1,331.05 |
| 974A | | | Apr. 19, 1950 | Sept. 30, 1951 | 2,758.89 | 781.08 | 2,205.34 | 1,334.63 |
| 23505 | | | Nov. 30, 1949 | Nov. 30, 1951 | 3,648.96 | 1,352.54 | 2,785.48 | 2,296.38 |
| 1349A | | | Feb. 28, 1951 | Feb. 28, 1951 | 400.00 | | 311.18 | 88.82 |
| 1351A | | | Mar. 30, 1951 | Mar. 30, 1951 | 2,267.72 | | 2,013.65 | 254.07 |
| | | | Mar. 30, 1951 | Mar. 30, 1951 | 2,267.72 | | 2,013.65 | 254.07 |
| 1356A | 1350-1352A¹ | | Apr. 30, 1951 | Apr. 30, 1951 | 9,400.00 | | 8,100.00 | 1,300.00 |
| | Ford J6-19 | | Apr. 30, 1951 | Apr. 30, 1951 | 2,497.43 | | 2,200.35 | 297.08 |
| Tr. body | | | May 31, 1951 | May 31, 1951 | 913.22 | | 813.22 | 100.00 |
| 1414A | | | July 31, 1951 | July 31, 1951 | 4,500.00 | | 4,000.00 | 500.00 |
| 1444A | | | Oct. 31, 1951 | Oct. 31, 1951 | 3,967.51 | | 3,471.31 | 496.20 |
| 1481A | | 1951 | Nov. 30, 1951 | Nov. 30, 1951 | 5,209.83 | | 4,628.54 | 581.29 |
| | | | Oct. 30, 1951 | Nov. 30, 1951 | 6,700.00 | | 6,500.00 | 200.00 |
| | | | Oct. 30, 1951 | Nov. 30, 1951 | 2,000.00 | | 1,950.00 | 50.00 |
| 1445A | | | Oct. 30, 1951 | Nov. 30, 1951 | 5,209.83 | | 4,628.54 | 581.29 |
| Total | | | | | $69,385.56 | $6,803.04 | $60,672.51 | $15,596.45 |

¹ 2 units.

Of these transactions only those involving the first 8 trailers listed were sold under the deferred payment arrangement described hereinabove. (The sale dates shown in those instances are the dates on which final payment was made and title was transferred. In each case the sale date shown is more than 6 months after the date of acquisition by the petitioner.) In all other instances, except the sale of 1 Plymouth, the date of acquisition and the date of sale are shown to be the same, which means that the assets were purchased and sold within the same month and were completed transactions.

In its 1950 and 1951 income tax returns the petitioner reported gross profits from its business in the respective amounts of $461,816.76 and $377,963.49 and net income in the respective amounts of $83,828.17 and $86,827.32. In such returns the petitioner treated the transactions listed above which involved property, title to which petitioner held for more than 6 months, as resulting in long-term capital gain or loss. All the other listed transactions were treated as resulting in short-term capital gain or loss. For 1950 it reported total net short-term capital gain of $4,250.78 and total net long-term capital gain of $946.04, or a total net capital gain of $5,196.82. For the year 1951 it reported total net short-term capital gain of $4,702.82 and total net long-term capital gain of $10,893.63, or total net capital gain of $15,596.45.

In determining the deficiency the respondent treated the reported gains of $5,196.82 and $15,596.45 as "gains from sales to customers in the ordinary course of a business and reportable as ordinary income," and increased the reported excess profits net income by those amounts.

The trailers which were the subject of the deferred payment arrangement and to which petitioner held title for more than 6 months, constituted property used in the petitioner's trade or business, and did not constitute property held primarily for sale to customers in the ordinary course of the petitioner's trade or business, or property which would properly be includible in the inventory if on hand at the close of the taxable year.

OPINION.

In determining the deficiencies in tax for the years 1950 and 1951 the respondent added to the reported excess profits net income the amounts of $5,196.82 and $15,596.45, which the petitioner had excluded on the ground that such amounts represented gains from the sales of capital assets. Section 433 (a) (1) (C) provides that the excess profits net income shall be the normal tax net income, excluding from the computation however, among other things, gains and losses from sales or exchanges of capital assets.

The amounts set forth above represent profits made by the petitioner upon sales of trailers, trucks, and automobiles and upon the installation of truck bodies. Some of the properties were sold for cash within a month after being obtained by the petitioner. In some instances trailers were acquired by petitioner and then turned over to brokers under a deferred payment arrangement, the petitioner retaining title until the agreed purchase price was paid more than 6 months after the petitioner purchased the property. At the hearing petitioner stated that the only transactions in issue are those last described. Furthermore, on brief, it refers only to the transactions involving trailers, states that the trailers are non-capital assets, and places its sole reliance upon section 117 (j),[1] which deals only with property used in the trade or business of a character which is subject to the allowance for depreciation and which has been held for more than 6 months. We construe this to mean that petitioner has conceded the correctness of the respondent's adjustment insofar as it relates to the gain from the other transactions. In any event, we think it clear that the gain on those transactions is not long-term capital gain. Our decision will therefore be confined to the trailer transactions involving deferred payments.

To meet the requirements of section 117 (j) the trailers in question (1) must have been property used in the petitioner's trade or business, (2) must have been of a character which is subject to the allowance for depreciation under section 23 (l), (3) must have been held for more than 6 months, (4) must not have been property of a kind which would properly be includible in the inventory if on hand at the close of the taxable year, and (5) must not have been property held by the petitioner primarily for sale to customers in the ordinary course of its trade or business.

The petitioner's business is that of transportation of goods as a common carrier. Since 1943, however, it has engaged others, who are owners of trucks and trailers and are known in the trade as brokers,

---

[1] (J). GAINS AND LOSSES FROM INVOLUNTARY CONVERSION AND FROM THE SALE OR EXCHANGE OF CERTAIN PROPERTY USED IN THE TRADE OR BUSINESS.—

(1) DEFINITION OF PROPERTY USED IN THE TRADE OR BUSINESS.—For the purposes of this subsection, the term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (l), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

(2) GENERAL RULE.—If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion * * * of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets.

to do the actual hauling. The petitioner charges its customers a fixed tariff and then pays a certain percentage thereof to the brokers for their services. Obviously in conducting a business in such a manner it is necessary that it have available to it a sufficient number of brokers with sufficient equipment to handle the transportation orders which it might obtain. The petitioner was able to purchase transportation equipment from the manufacturer at a fleet discount which was greater than could be obtained by brokers. Whenever a broker who hauled for petitioner requested it, the petitioner would order a trailer for such broker, taking title in its own name. It would then either sell the trailer outright to the broker or, if the broker did not have sufficient money or credit, would enter into a deferred payment arrangement as described in the Findings of Fact. In either case the petitioner gave the broker the benefit of a greater discount than the broker could have obtained had he purchased the equipment directly from the manufacturer. The petitioner did, however, in fixing the selling price to the broker, retain for its own benefit some portion of the discount.

As stated, we are directly concerned here only with those trailers which were the subject of the deferred payment arrangement, title to which was held by the petitioner for more than 6 months. The agreements between the petitioner and the brokers were oral and we are unable, from the meager and indefinite testimony with regard thereto, to reach a conclusion as to the proper classification of the transactions or the precise rights and obligations of the parties. However, neither the petitioner nor the respondent contends that the transactions were conditional sales with title retained by the petitioner merely for security purposes. In fact, the positions taken by both parties are inconsistent with such a view. The petitioner contends that the transaction was an agreement to sell when and if the credits to the account of a broker equaled the agreed price. The respondent contends that the arrangement was one of lease with option to buy.

The respondent does not contend that the trailers were not of a character subject to the allowance for depreciation under section 23 (1).[2] In fact he has allowed depreciation thereon during the time title was held by the petitioner. This is consistent with the position he now takes that the agreements were primarily leases. Nor does he question that the property was used in the petitioner's business. Otherwise, consistently he should have disallowed the claimed deduction for depreciation. But aside from this, since the position of each party is in accord with the view that the beneficial ownership in

---

[2] Section 23 (1) provides for a reasonable allowance for exhaustion, wear, and tear of (1) property used in the trade or business, or (2) of property held for the production of income.

the trailers did not pass to the brokers until title was passed, we believe that the trailers should properly be considered as property used in the petitioner's business. Under the agreements between the petitioner and the brokers, the brokers were specifically precluded from using the equipment for any other purpose than hauling for petitioner during the time the petitioner retained title.

The respondent does contend, however, that since in each instance it was contemplated that a sale would be consummated, the trailers should be considered as property held primarily for sale to customers in the ordinary course of petitioner's trade or business. The petitioner does not deny that a sale was contemplated in each case, but contends that its primary motive in entering into such transactions was to further its transportation business rather than to make a profit upon sales of equipment.

During the years in question the profit realized by the petitioner upon all sales of equipment (including that on equipment sold outright for cash and that which was the subject of the deferred payment arrangement) totaled $5,196.82 for 1950 and $15,596.45 for 1951. Of this profit about $4,000 and $9,000, respectively, represented profit due to the retention by the petitioner of a portion of the fleet discount. The remainder of the profit shown was the result of the adjustment of basis on account of depreciation taken by the petitioner on trailers during the time it held title thereto. In the case of the trailers which are in question here, namely, those which were subject to the deferred payment arrangement, and which had been held by the petitioner for more than 6 months, the profit realized due to retained discount was only about $1,200 in 1950 and about $4,500 in 1951. When it is considered that the net income reported by the petitioner from its business as a whole was about $83,000 in 1950 and about $86,000 in 1951, it appears that the profit on trailers, aside from the depreciation factor, constituted a relatively small portion thereof.

The purpose for which the property is held is the controlling factor. *A. Benetti Novelty Co.*, 13 T. C. 1072, *Latimer-Looney Chevrolet, Inc.*, 19 T. C. 120. Upon consideration of the testimony and the record as a whole, we are satisfied that the sale of the trailers at a profit was not the principal, or an essential or substantial, purpose of the petitioner in acquiring and holding them. The purpose that motivated the petitioner was the furtherance of its business of transporting property as a common carrier. It did not hold itself out as a dealer in this equipment, but merely sold to brokers who hauled for it and the sales were made to insure that its brokers would have sufficient equipment to handle the demands of the petitioner's business. We conclude, therefore, that the trailers in question did not constitute

property held primarily for sale to customers in the ordinary course of the petitioner's business within the intendment of section 117 (j). For the same reasons we also conclude that the trailers were not property of a kind which would properly be includible in the inventory if on hand at the close of the taxable year.

Both parties have referred to *Philber Equipment Corporation*, 25 T. C. 88, revd. (C. A. 3) 237 F. 2d 129. That case presented a different factual situation and is distinguishable from the instant case. There the taxpayer was in the business of leasing motor vehicles for a period substantially less than their useful lives and then selling them at retail at a profit. In one year the only profit made by the taxpayer was from such sales, the leasing operations having resulted in a loss. We there concluded that the sales were a significant aspect of the taxpayer's over-all business. Such is not the case here.

In view of the foregoing, we hold that the gains derived by the petitioner upon those trailers, title to which it held for more than 6 months and which were sold pursuant to the deferred payment arrangement described, should be considered as gains from sales or exchanges of capital assets within the meaning of section 117 (j), and that such gains should be excluded from the petitioner's excess profits income under section 433 (a) (1) (C).

*Decision will be entered under Rule 50.*