**LYNCH–DAVIDSON MOTORS, INC.**
(formerly Hal Lynch Motors,
Inc.), Plaintiff,

v.

Laurie W. TOMLINSON, District Director
of Internal Revenue, District of
Florida, Defendant.

Civ. A. No. 3610.

United States District Court
S. D. Florida,
Jacksonville Division.

July 23, 1958.

William R. Frazier, Jacksonville, Fla., for plaintiff.

George Elias, Jr., Washington, D. C., for defendant.

SIMPSON, District Judge.

This suit for the recovery of corporate income tax and interest thereon was tried to the Court without a jury. From the pleadings, exhibits, testimony and argument of counsel, the Court makes the following

### Findings of Fact

1. The plaintiff is a corporation organized and existing under and by virtue of the laws of the State of Florida, with principal office and place of business in Jacksonville, Florida.

2. The defendant is a citizen of the State of Florida, residing in Jacksonville, and was at all times herein mentioned the duly appointed, commissioned and acting District Director of Internal Revenue for the District of Florida.

3. This action is one to recover a corporate income tax and interest thereon erroneously or illegally assessed and collected without authority under the Internal Revenue laws of the United States.

4. That on or about August 15, 1949, plaintiff filed with and in the office of the then Collector of Internal Revenue at Jacksonville, Florida, its corporate income tax return, Form 1120, for its fiscal year ended May 31, 1949, and duly paid to the said Collector the income tax shown on said return to be due and owing by the plaintiff to the United States Government. That on December 12, 1955, the Commissioner of Internal Revenue assessed additional tax and interest thereon against the plaintiff as follows: Income tax in the amount of $3,193.99 and interest thereon in the amount of $1,252.48; that this additional tax and interest thereon were paid under protest to the defendant on March 2, 1956, and April 23, 1956, in the aggregate amount of $4,446.47.

5. That on May 10, 1956, the plaintiff filed with the District Director of Internal Revenue a duly executed written claim for refund of the said additional tax and interest thereon assessed against and collected from the plaintiff in the amount of $4,446.47, together with interest thereon at the rate of 6% per annum from the date of payment.

6. More than six months have elapsed since the date upon which plaintiff filed said claim for refund before instituting this suit, and the Commissioner had failed to act with respect to said claim.

7. The plaintiff during the period here involved operated under a franchise from Ford Motor Company for the retail sale of Ford automobiles and trucks. It operated a used car lot, a parts and service department, a body shop, a repair shop, a paint shop and a service station.

8. The sources of petitioner's income and the gross profit of each for the fiscal year ended May 31, 1949, were as follows:

| | Sales | Gross Profit |
|---|---|---|
| New vehicle department | $2,326,166.17 | $472,063.78 |
| Used vehicle department | 129,978.00 | (12,913.67) |
| Parts and Accessories department | 1,021,601.41 | 186,330.74 |
| Service Station (includes tires) | 166,457.80 | 32,212.26 |
| Body, paint, trim and glass department | 104,612.78 | 18,930.32 |
| Service department | 153,543.46 | 76,812.81 |
| Total | $3,902,359.62 | $773,436.24 |

9. The plaintiff served a trade area which included Duval County, Florida, and a surrounding trade area from the City of Jacksonville extending roughly from 100 to 150 miles, both north and south. During the year 1949, there were approximately 150 people employed by the corporation in the operation of its business.

10. During the fiscal period ended May 31, 1949, the plaintiff sold 1,316 new cars and trucks and sold 716 used units.

11. The plaintiff during the period in question followed the practice of paying cash to Ford Motor Company for its inventory of new cars and trucks. Ford Motor Company would draw a draft on the plaintiff payable through the Atlantic National Bank of Jacksonville for new cars and trucks it had shipped, so that the inventory was paid for upon delivery. The corporation also followed the practice of paying for all of its inventory of used cars and trucks and did not finance its inventory of these items.

12. New cars and trucks held by plaintiff for retail sale to customers were not driven at all by plaintiff with the exception of driving necessary for servicing and delivering these cars to customers.

13. Plaintiff's new cars held for sale in the ordinary course of business were not registered in its name. Likewise, used cars were not registered in plaintiff's name. Used cars were generally titled and registered in the name of the previous owner, who upon trading the car would assign his registration certificate in blank. When plaintiff sold these units, they were re-registered in the name of the new owner by the office of the Florida Motor Vehicle Commissioner.

14. During the fiscal year in question, the plaintiff utilized the standard form of bookkeeping prescribed by Ford Motor Company for its franchised dealers. Under this system, every car or truck which is purchased from the Ford Motor Company is charged into new car inventory, which is designated as Account No. 120. Whenever a car or truck was placed in company use, an entry was made whereby the vehicles were removed from Account No. 120 and placed in Account No. 154, which was designated on the accounting system as the Service Equipment Account. Account No. 154 was a fixed asset account.

15. The plaintiff depreciated its company cars (which term as used herein includes trucks) on the straight line method utilizing an estimated useful life of 36 months with a salvage value assigned to each unit of $50, which the Court finds to be a reasonable and fair rate. The company, or its predecessor, has used this basis of depreciating company cars since it began business sometime in 1934. Prior to the examination involved in this suit, the Treasury Department has never questioned plaintiff's right to depreciate its company cars and trucks in the manner stated.

16. When a company car was sold, it was removed from the company equipment account by appropriate entry on the corporation's records.

17. During the fiscal year ended May 31, 1949, the plaintiff had 37 company cars in service. During said fiscal year, the plaintiff sold a total of 17 company cars, 9 of which were held more than six months prior to date of sale, and 8 of which were held less than six months. Plaintiff reported its gain on the sale of vehicles held for more than six months as long-term capital gain in the amount of $2,388.60. The Commissioner allowed this treatment with respect to two of the vehicles and treated the gain from the balance as ordinary income.

18. The Commissioner of Internal Revenue in his original statutory notice issued in connection with this matter, a copy of which was attached to plaintiff's claim for refund, determined that the company cars constituted property held for sale to customers in the ordinary course of plaintiff's trade or business and were not, therefore, subject to any depreciation allowance under Section 23*(l)* of the 1939 Code, 26 U.S.C.A. § 23*(l)*,

and accordingly disallowed all depreciation claimed on these cars for the fiscal year ended May 31, 1949, in the amount of $6,544.46. The Commissioner also determined that the gain or loss resulting from the sale of a portion of these cars did not come within the purview of Section 117 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117, and accordingly the net gain from the sale of the company cars to the extent of $2,341.60 was eliminated from the net capital gain of $2,388.60 reported by the company.

19. The decision to place cars in company use was made by petitioner's management. As the cars were placed in service, they were covered by public liability and property damage insurance for the benefit of the plaintiff. Regular Florida license plates were procured for each of such cars in the plaintiff's name and the cars were registered in its name with the Motor Vehicle Commissioner for the State of Florida. Dealer tags were never used on cars used in company business. The plaintiff purchased a number of dealer license plates from the State of Florida which could be transferred from one car to the other in connection with the sale and delivery of new or used cars.

20. The evidence discloses that the company cars in issue were used by various officers and department heads of plaintiff in the general course of everyday business which included among other things lending the cars to customers while their cars were in for repair, for sending one out to a customer's home to pick up his car to bring it in for service, for transporting a parts salesman calling on customers over the State of Florida and South Georgia, for sending persons for license tags and paying off finance contracts around the City of Jacksonville, and the cars were used in making bank deposits and other business errands. The company also used one of the company cars during the year in question to participate in a high school driver's training program at Andrew Jackson High School in Jacksonville. They were also used at times in various civic functions, such as parades. Plaintiff's business would be crippled if it did not have the use of the company cars. The plaintiff's salesmen owned their own automobiles which were used as demonstrators in promoting the sale of new and used cars and trucks.

21. The Commissioner allowed the expense of operating the company cars amounting to $8,079.03 as shown by plaintiff's return for the fiscal year ended May 31, 1949.

22. The decision to sell the company cars was made by plaintiff's president. The company followed the practice of disposing of the company cars when the new models were brought out by the manufacturer. It was company policy to have its personnel using current model cars. Also, by using new models, the company cars were kept in good condition. Some of the company cars were also sold because they had been run what was considered excessive mileage.

23. Plaintiff's management deemed it advisable to have company personnel use current model company cars. After the decision was reached to sell these cars, they were often sold from plaintiff's used car lot and some of them were direct sales and also a few of the cars were sold at wholesale, and some of them were sold at auction.

All of the cars in issue upon which long-term capital gains treatment was claimed were held for more than six months and some were held for more than one year.

24. During the fiscal year in question, the plaintiff's management had to wait four or five months after a new model came out before the previous model company car could be replaced, due to the shortage of cars existing at that time and then existing customer demand for new cars. The company cars were assigned to plaintiff's president, the head of its parts room, the parts department manager, the manager of the service department, the manager of the body shop, the used car manager and the new car sales manager, and other personnel.

25. When plaintiff sold the company cars, it did not give a new car guarantee to the customer, but instead he was given the customary used car guarantee.

26. The automobile business in general during plaintiff's fiscal year ended May 31, 1949, was good, which accounted for the fact that the company realized more for the company cars when they were sold than would have been realized during more normal periods of business operation. There existed a seller's market during this time, due to the shortage of cars still remaining following World War II.

27. The plaintiff was one of the larger franchised Ford dealers and for several years has been designated as one of the top ten Ford dealers in the country.

28. On its return for the fiscal year ended May 31, 1949, plaintiff deducted $9,865.34 for depreciation on all of its company cars. These cars were used in the plaintiff's trade or business. During the fiscal year ended May 31, 1949, petitioner sold 17 company cars and trucks and of the gain realized reported the sum of $2,388.60 as long-term capital gain in its income tax return. The balance of the gain in the amount of $1,189.-16 was not reported as capital gains, since these cars were held six months or less. These cars were used in petitioner's trade or business, were not properly includable in petitioner's inventory and were not held primarily for sale in the ordinary course of its trade or business.

29. From time to time over the years, the plaintiff issued credit memorandums to its customers which primarily involved transactions wherein a customer would deliver a used car to the company and receive credit toward the purchase of another car, sometime in the future.

30. The balances due from time to time to customers represented by the credit memorandums were carried as a liability of the plaintiff on its books in an account numbered 205. In this account were recorded various customer's credit memos issued between the dates of January 1, 1935, and October 2, 1941, which aggregated the sum of $3,230.89 as disclosed by the records for the fiscal year ended May 31, 1949. The Commissioner in auditing plaintiff's books made an adjustment wiping out the $3,230.89 credit balance in the customer's credit memo account and carried this into plaintiff's taxable income for the year ended May 31, 1949. Plaintiff honors all customer credit memorandums when presented regardless of age. Account No. 205 was an active account during the year in question, and showed a balance of $4,870.19.

31. Plaintiff's franchise or sales agreement with Ford Motor Company contained a provision requiring the dealer to segregate customer deposits and treat same as trust funds.

32. The plaintiff did not keep any moneys represented by customers' credit memorandums in a special bank account, but any such funds were deposited in its regular account.

33. The customers' credit memos could be used by a customer to apply against the delivered cost of a new car or a new truck, as the case may be, and for no other purpose. The majority of these credits arose by persons trading in used automobiles and receiving a credit memo for the agreed value rather than cash. In some instances, there may have been small amounts in cash deposited by customers. The company makes no effort to seek out customers having credit memos but will honor them whenever they are presented for credit, regardless of age.

34. The Commissioner in auditing the plaintiff's returns for the fiscal year ended May 31, 1949, also disallowed the sum of $1,523.02 which was spent by the company in the purchase of liquor. It was the policy of the company's management to purchase the liquor in question primarily around Christmastime and to make gifts thereof to various of its customers to maintain and promote good will. Mr. T. T. Jones, the company's comptroller, was in charge of this matter, and had the only key to the room in which the supply of liquor was kept. Mr.

Jones also supervised the disposition of the liquor, as well as other merchandise which was likewise given to customers, such as fruit cakes, hams, cigarettes, and cigars. The Commissioner did not disallow any sum spent in this fashion, except the money spent for liquor. Mr. Jones also made the purchases of the liquor in question from the suppliers furnishing same.

35. The Commissioner also disallowed travelling expenses of $656.73 expended in connection with closing out Las Olas Autos, Inc., which adjustment counsel for the plaintiff conceded to be correct at the trial.

### Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter of this action.

2. The company cars and trucks involved in this proceeding, as shown by Exhibit 1 were bonafidely used in the operation of plaintiff's trade or business, were not properly includable in plaintiff's inventory, and were not held primarily for sale in the ordinary course of its trade or business under the provisions of Section 117(j) of the 1939 Code. See United States v. Bennett, 5 Cir., 1951, 186 F.2d 407; Smith v. Commissioner, 5 Cir., 1956, 232 F.2d 142; Latimer-Looney Chevrolet Company, Inc. v. Commissioner, 1952, 19 T.C. 120; A. Benetti Novelty Co., 13 T.C. 1072, and McCullough Transfer Company v. Commissioner, 1957, 27 T.C. 822; Fields v. Granquist, D.C.Or.1955, 134 F.Supp. 624; W. R. Stephens Co. v. Kelm, D.C.Minn.1956, 140 F.Supp. 12.

3. The plaintiff is entitled to the depreciation claimed on its company cars as shown by its corporate income tax return filed for the fiscal year ended May 31, 1949, under Section 23(l) of the 1939 Code.

4. The plaintiff is entitled to long-term capital gains treatment on the profits realized by it from the disposition of the company cars in issue for the fiscal year ended May 31, 1949, which had been held for more than six months at the date of sale under Sections 117(a) and 117(j) of the 1939 Code.

5. The Commissioner improperly added the sum of $3,230.89 to plaintiff's taxable income for its fiscal year ended May 31, 1949, by restoring to income unclaimed credits to customers' accounts in the amount of $3,230.89, which had been entered as liabilities on plaintiff's books and records between the dates of January 1, 1935, and October 2, 1941. If these deposits were properly includable in plaintiff's taxable income, they were taxable in years prior to the fiscal year ended May 31, 1949.

6. The plaintiff is entitled to deduct the sum of $1,523.02 in its Federal income tax return for the fiscal year ended May 31, 1949, representing purchases of liquor which was given to plaintiff's customers under the supervision and direction of its comptroller as an ordinary necessary expense within the meaning of Section 23(a) (1) of the Internal Revenue Code of 1939.

7. Plaintiff is not entitled to deduct travelling expenses of $656.73 claimed on its return for the fiscal year ended May 31, 1949, in connection with the closing out and replacing the management at Las Olas Autos, Inc.

8. The parties are directed to settle decree accordingly, the Court having been advised in advance of trial that counsel have agreed to compute the amount of refund to which the plaintiff might be entitled and to submit same to the Court together with a proper form of judgment to be entered in this cause.