**GRANT OIL TOOL COMPANY**
v.
**The UNITED STATES.**
No. 35–64.

United States Court of Claims.
July 20, 1967.

Stuart T. Peeler, Los Angeles, Cal., for plaintiff. David W. Richmond, Washington, D. C., attorney of record. Joseph D. Peeler, Richard A. Gadbois, Jr., and Musick, Peeler & Garrett, Los Angeles, Cal., of counsel.

Philip R. Miller, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant. E. Alan Moorehouse, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

NICHOLS, Judge.*

This is a suit for refund of corporation income tax deficiencies and interest assessed by defendant and paid by plaintiff for the calendar years 1956, 1957, and 1958, in the amount of $56,810.01, plus interest as provided by law. Claims for refund were timely filed and denied, and the same basis for recovery was asserted therein as alleged in this timely action. Determination of the amount of recovery, if any, is reserved for further proceedings.

Plaintiff is a California corporation, with principal place of business at Los Angeles, engaged in the business of manufacturing, renting, and selling of specialized oil well drilling tools to oil well drillers. The tools consist of bodies which have a useful life of several years and may be used in the drilling of many wells, and attachable parts which are attached to the bodies and generally wear out in the drilling of one well. In the course of drilling, plaintiff's tools were sometimes irretrievably lost in the drill holes, or damaged beyond repair by negligence of the driller, or permanently misplaced by the driller, in which event the driller was required to make an agreed payment to plaintiff for the tool bodies. The question presented [1] is whether on these contractual payments for the loss of the bodies of these tools, plaintiff was entitled to capital gains treatment pursuant to § 1231 of the Internal Revenue Code of 1954, 26 U.S.C. § 1231 (1964) [2],

---

* This case was referred to Trial Commissioner Roald Hogenson, with directions to make findings of fact and to recommend conclusions of law. The commissioner has done so in an opinion and report filed October 3, 1966. The court is in agreement with the findings of the commissioner. While we reach the result arrived at by the commissioner, we do so by a different route.

1. In its brief to the trial commissioner, defendant has withdrawn its further defense stated in its First Amended Answer pertaining to depreciation deductions on the tool bodies.

2. § 1231. Property used in the trade or business and involuntary conversions.

(a) General rule.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such

or whether the gain realized therefrom was ordinary income as determined by the Commissioner of Internal Revenue.

Section 1231 [3] provides for long-term capital gains treatment of gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part) of property subject to an allowance for depreciation which has been held by the taxpayer for more than 6 months and which has been used in taxpayer's trade or business. However, the property cannot be inventory or property held primarily for sale in the ordinary course of taxpayer's trade or business.

Plaintiff manufactures its oil well drilling tools from raw steel of high quality at its plant in Los Angeles, California, with the use of gun drilling machines, milling machines and lathes. In the typical tool, the body is a precisely machined cylinder from 6 to 11 inches in diameter, from 5 to 8 feet in length, weighing 800 pounds, with the overall cost averaging $1 per pound. Pockets or depressions are cut into the exterior of the body to accommodate attachable parts consisting of cutter blades, pins, bushings, and lock plates, weighing 40 to 50 pounds, with an overall cost of about $75. Plaintiff manufactures the cutters, but purchases the other parts. These parts are not interchangeable with those manufactured by any competitor. However, the parts and body are designed to be used as a single tool, and neither the parts nor the body can be used without the other.

Plaintiff's tools perform special functions in rotary well drilling. In such drilling, the drill bit is at the end of a series of pipe lengths known as the drill stem. As the stem is rotated from above, the bit loses its gauge, and the drill hole is reduced in diameter. Plaintiff's tool is attached between two lengths of pipe in the drill stem above the bit, and the attached cutters ream the hole to a larger diameter than provided by the bit. Plaintiff's tools are also placed at varying distances above the bit to stabilize the drill stem and maintain straight drilling.

Plaintiff's tool bodies have a useful life which varies from 6 months to several years, depending on the type of body, the circumstances of its use, and frequency of use. The average useful life of the bodies is from 2 to 5 years. The attachable parts wear out regularly and usually are replaced several times in one drilling operation. The principal causes of body wear are: (1) The force of drilling fluid pumped into the drill stem under high pressure, and (2) necessary shortening by plaintiff of a tool body to provide joints and thread thereon to match those of a particular drill stem, with repeated rethreading resulting in the body being too short to be used.

In the course of rotary oil well drilling, the drill stem sometimes breaks, leaving a portion of the drill stem with

---

sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

\* \* \* \* \*

(b) Definition of property used in the trade or business.—For purposes of this section—

(1) General rule.—The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more then 6 months, and real property used in the trade or business, held for more than 6 months, which is not—

(A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year,

(B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * *

\* \* \* \* \*

3. Section 1231 was amended for the years beginning after December 31, 1957, by Section 49, Technical Amendments Act of 1958, P.L. 85–866, 72 Stat. 1606, 1642, in respects not material here.

specialized tools like those of plaintiff at the bottom of the hole. Depending upon the economics of the situation, the drilling contractor either abandons the hole, attempts to retrieve the severed portion of the drill stem by use of specialized tools in a fishing operation, or engages in whipstocking, that is, plugs the hole to the point of break and drills around and permanently abandons the severed portion of the drill stem and its attached tools. All decisions and all actions taken in the case of a severed drill stem with plaintiff's tools attached are those of the driller, and plaintiff has no voice or control over the retrieval or abandonment of its tools. To the driller, the agreed value of plaintiff's tool is usually of little consequence compared to the cost of the rest of the drilling operation.

Plaintiff maintains branch offices in oil producing areas of the United States and Canada. It faces heavy competition in its business, and normally its employees are competing with representatives of from 6 to 18 competitors to secure the use of its tools by a driller. Drilling contractors consider the quality and adaptability of a given tool to the particular job, the price to be charged for its use, and the services to be rendered by the supplying company.

Plaintiff makes infrequent domestic sales (United States and Canada) of its tool bodies and attachable parts, and some foreign sales. The tools sold, both foreign and domestic, are specially manufactured by plaintiff to conform to the specifications of the purchasers after receipt of orders, and are not supplied from any stocks maintained by plaintiff. None of the tools used by plaintiff in its domestic rental business was ever sold foreign or domestic.

While plaintiff's tool bodies on hand rose from 1,869 to 2,900 during the 3 years in issue, and while plaintiff manufactured an average of 651 of such bodies per year during that period, plaintiff made domestic sales only at the yearly average of 9, and foreign sales averaging 100 annually.

During the years in issue, plaintiff's gross receipts from the tool bodies and parts were $6,827,833.50. Of this sum, 23.30 percent, or $1,584,285.62, were receipts derived from the tool bodies, as follows:

Tools-lost-in-hole charges . $ 252,310.44
Body rental charges ...... 1,114,694.17
Sales of tool bodies:
 Foreign ............... 192,139.91
 Domestic ............. 25,141.10

 Total ............... 1,584,285.62

The tools-lost-in-hole charges were thus 15.93 percent of the total tool body receipts, and 3.70 percent of plaintiff's total receipts on both the tool bodies and parts.

Plaintiff maintained no inventory of tool bodies at its principal place of business in Los Angeles, but did keep on hand there a supply of parts. The solicitation of rentals of tool bodies and parts by drilling contractors is done by plaintiff's branch office employees in the field. Plaintiff supplies tool bodies and parts to its branch offices only on requisitions from branch managers who maintain a supply based on their best estimates of local rental demands. Plaintiff's employees do not solicit sales because plaintiff desires to maintain strict quality standards in the use of its tools and because it can obtain more revenue from leasing its tools. Drillers in the domestic market do not seek to make purchases because it would be uneconomical for them to maintain a stock of tools of the various types and sizes needed in various drilling operations. Plaintiff's practice of renting its tools and charging for their use in the domestic market is traditional and customary in the industry. No competitor employs a different arrangement. Renting is not practiced in the foreign market because overseas drilling operations are usually major projects carried on by large oil companies which standardize their operations

to minimize the problem of long lines of supply, and foreign drillers prefer to purchase specialized tools which can be repeatedly used by them.

In the domestic market, the tool bodies remain the property of the plaintiff, except for the infrequent domestic sales above-mentioned, and plaintiff requires their return at the conclusion of their use. The drillers are charged for the tools according to a price list published by plaintiff, with a flat fee charged for each set of attachable parts used, and with the charge for the use of the body being on a per well, per day, or per month basis. Plaintiff's employees pick up the bodies and parts from the driller after their use. The used parts are examined and some reused. The unusable parts are scrapped, as are any bodies which have become worn or excessively shortened. Neither the parts nor the bodies are paid for by the driller until they are used, and there is no charge unless there is use. The charges for the parts and bodies are segregated on the invoice presented to the driller. Due to competition in some areas, no charge is made for use of a body in about 10 to 15 percent of plaintiff's transactions. A charge is always made for use of the parts.

If the driller is unable to return plaintiff's tool bodies because they have been lost in the drill hole or because they have been misplaced or because they have been damaged beyond repair by negligence of the driller, plaintiff requires the driller to reimburse it for such tools in accordance with the following clause of plaintiff's rental agreement:

Rental equipment remains the property of the Grant Oil Tool Company and shall be delivered to them on demand. If lost or damaged beyond repair, user will be charged at sale price of new equipment.

The driller is charged the amount set forth in plaintiff's charge schedule for tools-lost-in-hole, which is the same as the selling price of new tool bodies sold in the foreign market. No adjustment is made for the age or condition of the tool body. No additional charge is made for parts not returned or damaged beyond repair.

In its accounting records and federal income tax returns, plaintiff treated as ordinary income, receipts from the use (per well, per day, or per month) of tool bodies, from the use of parts, from the sales foreign and domestic of bodies and parts, and from the scrap sales of bodies and parts. In such records and returns, plaintiff did not treat its tool bodies held for rental as inventory items but as depreciable property used in its trade or business, creating a separate asset and reserve account for each body, identified by serial number marking, and recovering its cost thereof through annual depreciation allowances.

Such treatment was never questioned by the Internal Revenue Service on audit of plaintiff's income tax returns for taxable years prior to 1956. Plaintiff's estimates of the average useful lives of its tool bodies contemplated, that, on the average basis, such bodies would be used until they were worn out. These estimates of the average useful lives of its nue Service for depreciation purposes for the years in suit. Each of the tool bodies concerned in the present action was held by plaintiff for more than 6 months prior to being lost in a drill hole, damaged beyond repair, or permanently misplaced by a driller. The number of tools damaged beyond repair and permanently misplaced is relatively insignificant compared to the amount lost in holes.

The recognized gains on the dispositions of such tool bodies exceeded plaintiff's recognized losses during the years concerned from sales, exchanges, and involuntary conversions of property used in its trade or business, by the entire amount of such gains. To account for such bodies, plaintiff treated the excess of the payments received from the drillers for such losses over plaintiff's adjusted basis in such bodies as long-term capital gains.

The hazardous nature of the oil well drilling business is such that it can be reasonably expected that some tools will be lost in the hole. Obviously, plaintiff's chances of losing tools are increased the more they are employed, but not necessarily in proportion to the increase in the amount of footage drilled. Losses follow a random pattern. They seem to increase in relation to certain geographical areas, types of wells, and specific tools, but there is no way to predict how often, when, or at what depth tools will be lost. Plaintiff lost 95 tools in the hole in 1956, 146 in 1957, and in the years 1958 through 1960, there was a successive decline in such losses from 141 to 120 to 102, even though plaintiff's tools on hand steadily increased from 1,869 at the beginning of 1956 to 3,026 at the end of 1960.

The literal language of § 1231, so far as it is applicable herein, requires, as a prerequisite to capital gains treatment, that plaintiff's tool bodies be used in its trade or business, that they be subject to the allowance for depreciation, that they be held for more than 6 months prior to their disposition by way of sale, exchange or involuntary conversion, and that they not be property of a kind which would properly be includable in the taxpayer's inventory if on hand at the close of the taxable year or property that would be held by the taxpayer primarily for sale to its customers in the ordinary course of its trade or business. In addition, the basic condition of § 1231 for capital gains treatment is that the recognized gains on the qualifying dispositions of the property in question must exceed the recognized losses therefrom. In the instant case, all the prerequisites are met, and the taxpayer's gain did exceed its losses, and by the entire amount of such gains.

The Government makes three arguments, any one of which it claims entitles it to prevail in this case. It asserts that the receipt of the lost-in-hole charges did not constitute a sale, exchange or involuntary conversion; that

the tool bodies were property "of a kind" that would properly be includable in the inventory of Grant Oil; and, relying heavily on Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), it contends that the Supreme Court has established two cardinal principles which are controlling in this case: (1) That legislative intent requires that the exceptions from ordinary income taxation be strictly construed, and (2) that where the receipts are not the kind of gain for which Congress intended preferential treatment, capital gains treatment must be denied even though the transaction qualified under the literal language of the capital gains provisions. We treat each argument in the order in which they are previously set forth.

*First:* The Government has found it difficult to visualize how Grant Oil concludes that the receipts attributable to its lost-in-hole charges represent the proceeds of an "involuntary conversion." We think the definition of that term, as contained in § 1231(a), clearly covers this case.

 A "compulsory or involuntary conversion" under § 1231(a) requires a lawful or tortious taking of property used in the taxpayer's trade or business. Walter A. Henshaw, 23 T.C. 176 (1954) (acq.); Guy L. Waggoner, 15 T.C. 496 (1950) (acq.). See Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 135, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); 3B Mertens, Law of Federal Income Taxation, § 22.125 (Malone Rev. 1966). However, by express provision it also includes "destruction in whole or in part" of said property. This need not be a physical annihilation, for "destruction" can also mean "rendering the thing useless for the purpose for which it was intended." Walter A. Henshaw, *supra,* 23 T.C. at 182. In the case at bar, when the taxpayer's tool bodies are lost in the drill hole they are no longer of any use or value to the taxpayer or the drilling contractor. In an economic sense they have been totally destroyed and this com-

plete and unwanted destruction of taxpayer's tool bodies is clearly within the definition of "involuntary conversion" as set forth in § 1231(a). Fishing Tools, Inc. v. Usry, 232 F.Supp. 400 (E.D.La. 1964); Walter A. Henshaw, supra.

In speaking of those cases where the treatment of gain from the sale or exchange of depreciable business property resulted in an undue hardship to the taxpayer, the House Ways and Means Committee, in reporting on what is now § 1231, used as examples, among others, the cases "where the proceeds of insurance on destroyed property exceed the cost of the property" and "gain or loss resulting from the involuntary conversion of property into other property or money * * *." H.R. No. 2333, 77th Cong., 1st Sess., pp. 53–54 (1942–2 C.B. 372, 415). In the case at bar the destruction of plaintiff's tool bodies, in addition to being an involuntary conversion, is in a way analogous to an insured casualty loss. Had plaintiff insured its bodies for their replacement cost, upon the destruction thereof it would have received approximately the lost-in-hole charge it actually levied, as that charge was meant to provide the funds needed to replace the lost body. Here, instead of contracting with a private insurer, plaintiff, through the levy of the lost-in-hole charge, had the drilling contractors substitute for an insurer of its bodies.

We note that the losses of tool bodies in holes are occurrences that are remunerative to plaintiff, to the extent that the charge for such losses is the same as the selling price of similar new bodies sold in the foreign market, while more often than not, the lost bodies have been fully or partially depreciated on the plaintiff's books. Though plaintiff stands to profit by this arrangement, it "profits" only in the sense that it receives money it would not otherwise get. Testimony at the trial showed that most, if not all, of the lost-in-hole charge is used to cover the cost of producing a new tool body and the general and administrative expenses of Grant Oil connected with such production. See Fishing Tools, Inc., supra, 232 F.Supp. at 402. However, this procedure was adopted by plaintiff to assure that drilling contractors would take every precaution to avoid abandonment of the tool bodies unless recovery thereof would, from the contractor's viewpoint, be economically unfeasible. All decisions with respect to the course of action to be taken in case of a break in the drill stem (in which the tool body is contained) are made by the drilling contractor, and plaintiff has no voice in the matter. The decision as to whether to "fish" for the body, to abandon the hole, or to whipstock (plug the drill hole up to the point of the break in the stem and drill around the severed portion) is made by the driller based on the economics of each course of action. The fact that plaintiff's tool is lost is of little consequence to the driller. The tool is of inconsequential value compared to the other costs of the driller's operation. The procedure adopted by plaintiff is all that it could do to avoid the method of disposition in question.

The Government argues that the decision in Nehi Beverage Co., 16 T.C. 1114 (1951), precludes a finding of an involuntary conversion in this case. There a soft drink bottler and distributor, when the deposits on bottles exceeded the number of bottles in the hands of its retailers, transferred the surplus of deposits from a liability to an income account. The Tax Court held that the failure of the taxpayer's retail dealers to return the bottles did not entitle the bottler to capital gains treatment on the deposits. The Tax Court said (at p. 1124) there was no involuntary conversion because Nehi Beverage, voluntarily, through the unilateral action of its board of directors, made the accounting entry to transfer the funds. We note that this transfer was done at an arbitrary time when the taxpayer was unable to tell whether the bottles had *actually* been destroyed or were still in existence. Without commenting on the merits of the Tax Court's approach to the facts before it, in the

instant case Grant Oil's action—the levy of the lost-in-hole charge—is taken only when the economic nonexistence of the tool bodies is a certainty; there is no arbitrariness about the time of its action.

Our decision in Philadelphia Quartz Co. v. United States, 374 F.2d 512, 179 Ct.Cl. ——, (1967), establishes that a conversion does not lose its involuntary character because the owner of the property in question yields possession of it to bailees who he knows will fail to return his property in some instances. There, as is true here, the owner retained title and assessed loss charges sufficient to deter any attempt to purchase the property *de facto* through the simple means of omitting the return of it.

*Second:* § 1231(b) (1) (A) excludes from capital gains treatment, even though it is depreciable business property used in the taxpayer's trade or business, "property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year". The question here is whether Grant Oil's tool bodies, which are produced by it in quantity as the end product of its manufacturing cycle, fall within that exclusionary language. The test to be applied in answering this question is not whether the property *is* included in inventory by the taxpayer but whether the property is *"properly includible"* in "the inventory." Mary Alice Browning, 9 CCH Tax Ct.Mem. 1061, 1066 (1950). However, before we can apply this test we must know what "the inventory" of Grant Oil is. (Emphasis supplied.)

■ Inventory is, in its present context, simply stated, property that is held for *sale*. See Forrester v. Americus Oil Co., 66 Ga.App. 743, 745, 19 S.E.2d 328, 330 (1942); MacFarland, Ayars & Stone, Accounting Fundamentals 200 (3d ed. 1957); 3 CCH 1967 Stand.Fed.Tax.Rep. paragraph 2936.017; 2 P-H 1967 Fed. Tax Serv. paragraph 6550. The Treasury Regulations recognize this, for in defining "gross income" they focus their attention upon the cost of goods sold computation, in which the use of inventories is an integral part.[4] By subtracting the cost of goods *sold* from gross *sales* the taxpayer arrives at its gross profits from *sales*. Thus, the use of inventories helps to determine *sales* income.

■■ Of course, the definition of inventory to mean only property held for sale may not apply in another context. It may also mean, in appropriate context, "a list or schedule of property, containing a designation or description of each specific article." Black, Law Dictionary (4th ed. 1951). However, we think this definition refers to the inventory a business would keep of its stamps or stationary supplies or that which an individual would keep of the books in his personal library. To be consistent with the scope and purpose of § 1231, "the inventory" it excludes must be that from which the taxpayer gets his normal sales profits. We are concerned in this case with Grant Oil's domestic operations. In that sphere, excluding its sale of tool bodies when a contractor so demands, it does not solicit sales of bodies, it only rents them.

■■ The tool bodies held for rental would be "properly includible" in the taxpayer's financial statement under the heading "property, plant and equipment,"

---

4. Treasury Regulation § 1.61–3(a) (1957) states: "In a manufacturing, merchandising * * * business, 'gross income' means the total *sales*, less the cost of goods *sold*, plus any income from investments and from incidental or outside operations or sources. Gross income is determined without subtraction of * * * items not ordinarily used in computing cost of goods sold." (Emphasis supplied.)

Cost of goods sold is computed in the following manner: to inventory on hand at the beginning of the year is added the cost of purchases (be it of raw materials, work in process, or finished goods) made during the tax year in question. By subtracting closing inventory from that total cost of goods sold is reached.

not in "inventory": finished goods, work in process and raw materials. The rental tool bodies are not held for sale. They are relatively long-lived capital investments used in Grant Oil's tool body rental and parts furnishing business. Even if Grant Oil were to have an inventory of its tool bodies held for sale, tool bodies held for rental would not be "properly includible" therein. Merchandise, to be "properly includible" in "the inventory" that § 1231 excludes, must be held for *sale* at a profit. Francisco Sugar Co. v. Commissioner, 47 F.2d 555 (C.A.2d, 1931).

■ Without specific discussion of the inventory question, it has been held that a taxpayer holding an item for retail sale as an everyday part of its operation may use that same item in its business and, if that use is bona fide, the item will not be said to be primarily held for sale (a contention the Government does not make in this case) or properly includible in inventory. Lynch-Davidson Motors, Inc. v. Tomlinson, 172 F.Supp. 101 (S.D.Fla., 1958); Latimer-Looney Chevrolet, Inc., 19 T.C. 120 (1952) (Acq.); McCullough Transfer Co., 27 T.C. 822 (1957) (Nonacq.). We note that in none of these cases did the taxpayer itself produce the property in question. However, the important question, as our discussion of the Government's third contention will illustrate, is not who produced the property but for what purpose was the property held? In any event, the Internal Revenue Service recognizes, as did Government counsel in oral argument, that a taxpayer can be the manufacturer of its own § 1231 assets. See Rev.Rul. 55–706, 1955–2 C.B. 300; Rev.Rul. 62–141, 1962–2 C.B. 182, superseding Rev.Rul. 55–706, as the latter applies to sales made before August 27, 1962.

In the analogous area of auto sales dealers who take cars that would otherwise be held for sale by them and use them in their business as "company" cars, see, e. g., *Lynch-Davidson Motors,*

*Inc.* and *Latimer-Looney Chevrolet, Inc.,* supra, the Internal Revenue Service has ruled that to overcome the presumption that all vehicles he acquires are held as stock in trade primarily for sale, the auto dealer must show that the vehicle in question was expressly acquired for, and actually devoted to, use in the dealer's business (other than for "demonstration" purposes) *and that he looks to normal depreciation in the ordinary course of operations to recover his cost* (and not to the sales of the cars for the recovery of most or substantially all of his investment therein). Rev.Rul. 60–15, 1960–1 C.B. 22, amplifying Rev.Rul. 54–222, 1954–1 C.B. 19. In the case at bar, Grant Oil created a separate asset and reserve account for each rental body used in its business, identified it by serial number marking, and recovered its cost through annual depreciation allowances. (Emphasis supplied).

Therefore, in accordance with the preceding discussion, the lost-in-hole charges derived from the involuntary conversions of rental tool bodies are not denied capital gains treatment by § 1231 (b) (1) (A) or any other part of § 1231.

*Third:* The Government's final argument, that relating to the applicability of the *Corn Products,* supra, doctrine to § 1231 assets, has come before us before. See, e. g., E. I. du Pont de Nemours & Co. v. United States, 288 F.2d 904, 153 Ct.Cl. 274, (1961) and *Philadelphia Quartz Co.,* supra.

We continue to question whether *Corn Products* has any proper impact on § 1231. In any event, our decision herein, in adherence to our interpretation of the *Corn Products* doctrine as expounded in *du Pont,* supra, (288 F.2d at 909, 153 Ct. Cl. at 283–284) and *Philadelphia Quartz,* supra (374 F.2d at 515), is that the Government is not entitled to prevail.

■ Even if we were to apply the *Corn Products,* supra, doctrine in the situation here involved, the taxpayer would still be entitled to § 1231 treatment on its lost-in-hole charges. While both

parties agree the receipts from actual rentals and sales made by Grant Oil would be ordinary income, it does not follow that the receipts from the involuntary conversions of the tool bodies held for rental would likewise constitute ordinary income. The ultimate question in determining the nature of such receipts is the purpose for which the tool bodies were held. E. I. du Pont de Nemours & Co., supra, 288 F.2d at 909, 153 Ct.Cl. at 283; Philber Equipment Corp. v. Commissioner, 237 F.2d 129, 131 (C.A. 3d, 1956); Fields v. Granquist, 134 F. Supp. 624, 626 (D.Or., 1955); McCullough Transfer Co., supra, 27 T.C. at 832. And, the final disposition of the property will only be decisive if the taxpayer's business is operated with the final gains from such disposition being a determining business purpose. *Philber Equipment Corp.*, supra, 237 F.2d at 131–132. Grant Oil's normal business is the rental of tool bodies and the parts attachable thereto, with sales of bodies being made only in reluctant response to demand of domestic drillers or in response to special foreign orders. The involuntary conversions of the rental bodies are not integral to this business nor are they at the core of it. They are unwanted occurrences which Grant Oil does all it can to avoid.

The defendant has filed a number of exceptions to the findings as submitted by the commissioner. All are in the nature of requests for amplification and do not raise any question as to the accuracy of the findings made. The plaintiff objects to virtually all the changes proposed. None of them, separately or together, would if made lead to a different conclusion than the one we arrive at. Pursuant to Rule 66, we presume the commissioner's findings are, correct, and we are shown nothing to establish the contrary. Therefore, the commissioner's findings are not modified as requested.

In conclusion, we hold that the income from the lost-in-hole charges is entitled to capital gains treatment under § 1231, and that plaintiff is, accordingly, entitled to recover and judgment is entered for plaintiff. The amount of recovery will be determined pursuant to Rule 47 (c) of the Rules of this court.