MAFCO EQUIPMENT COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mafco Equip. Co. v. Comm'r
Docket No. 10576-81. United States Tax Court
T.C. Memo 1983-637; 1983 Tax Ct. Memo LEXIS 153; 47 T.C.M. (CCH) 88; T.C.M. (RIA) 83637; October 13, 1983. Bart A. Brown, Jr. and Michael H. Brown, for the petitioner. Mark S. Feuer, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined deficiencies in petitioner's Federal income taxes as follows: Fiscal Year Ending
Deficiency
May 31, 1976
$4,349.00
May 31, 1977
51,046.00
The sole issue for decision is whether income realized by petitioner from sales of certain items of tangible personal property during its fiscal years 1976 and 1977 should be afforded capital gain treatment under section 1231. [1]
*155 FINDINGS OF FACT Some of the facts have been stipulated and are so found.The stipulations of fact, together with the exhibits attached thereto, are incorporated herein by this reference. Mafco Equipment Company (hereinafter "petitioner") is a corporation whose principal place of business was at Harrison, Ohio, on the date the petition in this case was filed. Petitioner filed its U.S. corporate income tax returns for its fiscal years ending May 31, 1976, and May 31, 1977, with the Internal Revenue Service Center at Covington, Kentucky. Saince its incorporation in 1966, petitioner has been engaged in a progressively expanding business of leasing specialized equipment to companies which build and maintain power generation plants. In 1966, petitioner had only about 10 items of equipment in its rental fleet. By June 1, 1975, petitioner's fleet had grown to 324 items and further expanded to 375 items by July 31, 1977. [2] During the years in issue, substantially all of the equipment constituting petitioner's rental fleet was of a kind used in lifting, positioning and attaching various materials to boilers of power generation plants.Such equipment consisted principally of cranes, *156 derricks, hoisting engines, air tuggers, elevators, manual lifting equipment, welders and air tools. *157 Petitioner's leasing business is a substantial enterprise. Petitioner has placed rental property in more than 40 states of the contiguous United States. On June 1, 1976, the cost of petitioner's total investment in its rental fleet exceeded $1,100,000 and on May 31, 1977, such cost exceeded $1,900,000. On its Federal income tax returns for its fiscal years ending 1976 and 1977, petitioner reported gross receipts of $999,562 and $1,135,959, respectively, exclusive of gains petitioner derived from sales of its depreciable assets. [3]
*158 Petitioner does not manufacture the equipment comprising its rental fleet, but purchases it. Because of the highly specialized nature of much of the equipment involved, petitioner often finds it extremely difficult to acquire particular items within a reasonable period of time after it determines that it has a need for them, and unavailability of equipment could mean the loss of a leasing customer.Moreover, petitioner considers that it is more profitable to lease rather than to sell equipment in its rental fleet. For these reasons, petitioner resisted attempts by ite leasing customers or others to purchase items from its rental fleet so long as they remained in good working condition. During the years in issue, it was petitioner's established policy not to sell items from its fleet which it considered to be in rentable condition. Petitioner leased its equipment pursuant to the terms of a standard rental agreement. This agreement contained no option to purchase petitioner's equipment and, in fact, contained the following clause: Rental Contract Only
14. This is a contract of rental only, and Customer acquires no right, title or interest in or to Equipment except as expressly *159 provided in this Rental Agreement. Customer shall not suffer any liens or encumbrances to attach to Equipment or any part thereof and shall defend, indemnify and hold Owner harmless from all loss, liability and expense by reason thereof. Customer shall not sublet Equipment nor assign this Rental Agreement in whole or in part. In the event Customer shall permit sub-contractors or others not in Customer's employ to operate or use Equipment, Customer shall see that such operation or use by others at all are in accordance with this Rental Agreement, and Customer shall remain fully responsible to Owner for all such use by others.
Under certain rather well-defined circumstances, (discussed infra), petitioner modified its standard rental agreement to reflect unique aspects of particular transactions. Petitioner's leasing business was a dynamic, ongoing enterprise. During the years in issue, petitioner purchased numerous items for use in its rental fleet, and also sold certain of these depreciable assets from its fleet. Sales by petitioner of depreciable assets during its fiscal years ending 1976 and 1977 generated reported net gains of $34,534, and $419,638, respectively. *160 Some of these gains were reported by petitioner as ordinary income either because the property which generated the gains was held by petitioner for six months or less, or pursuant to the section 1245 recapture provisions. The gains (and losses) which were generated by the sales of assets held by petitioner for six months or less were not netted by petitioner against gains (and losses) generated by assets held by petitioner for more than six months. Of the $34,534 reported by petitioner as gains from the sale of its depreciable assets during its fiscal year ending 1976, petitioner reported $10,369 as ordinary income and $24,165 as long-term capital gain. Of the $419,638 reported by petitioner as gains from the sale of its depreciable assets during its fiscal year ending 1977, petitioner reported $136,051 as ordinary income and $283,587 as long-term capital gain.The evolution of petitioner's rental fleet during the years in issue is demonstrated by the following chart: Rental
Rental
Rental
Rental
Fleet
Purchased
Sold
Fleet
Purchased
Sold
Fleet
Equipment
6/1/75
Fiscal 76
Fiscal
6/1/76
Fiscal 77
Fiscal
5/31/77
76
77
Cranes
2
1
3
9
1
11
Derricks
16
5
21
11
5
27
Hoists
49
1
48
25
6
67
Elevators
4
7
11
5
6
10
Air Tuggers
12
2
1
13
14
7
20
Trailers
6
1
7
1
8
Freight Cars
1
1
1
8 Pack Welders
6
2
1
7
7
1
13
Electric
Welders
8
1
9
3
6
Gas Welders
31
1
30
1
3
28
Generators
11
1
10
4
14
Mast Section
1
1
0
Heaters
20
20
3
17
Air Tools
30
30
1
31
Impact Wrenches
6
6
6
0
Air Nailer
2
2
2
0
Die Grinder
1
1
1
0
Clay Digger
1
1
1
Vibrator
3
3
3
Torque
Convertors
1
1
1
Paving Breaker
4
4
3
1
Come-a-long
17
17
5
12
Air Compressor
15
1
1
15
4
1
18
Spiders
11
11
4
18
9
9
Compactors
5
3
2
3
4
1
Dollies
7
7
7
Jacks
18
18
1
3
16
Aluminum Picks
18
18
8
7
19
Water Pumps
6
2
4
2
6
Trolleys
13
13
2
3
12
Ladders
5
5
5
Slings
6
6
6
Load Chain
1
1
1
Air Mover
1
1
1
Block & Sheaves
4
4
1
3
Mortar Mixer
1
1
1
0
Electric
Grinder
1
1
1
0
TOTALS
324
51
16
359
98
82
375
*161 The sales by petitioner if items from its rental fleet during the years in issue occurred under certain rather well defined circumstances which are set out in the following paragraphs. I "Category I Sales:" Lost or Stolen Property
Because of the nature of the projects on which petitioner's leasing customers worked, it was inevitable and anticipated by petitioner that some of the equipment leased to such customers would be lost, stolen from the job site or damaged by the lessee. To take account for these situations, it was petitioner's well-established policy to require the lessee to replace any lost, stolen or damaged equipment with a piece of similar equipment, or, in the alternative, to "purchase" (i.e., pay for) such equipment for an amount equal to the value of the lost, stolen or damaged item. Thus, Paragraph 10 of the standard rental agreement used by petitioner provided: Damaged Responsibility
10. All loss or damage to Equipment of any part thereof from any cause whatsoever, including but not limited to fire, theft, comprehensive losses, collision and upset, shall be the sole responsibility of Customer and shall be paid by Customer promptly upon receipt *162 of Owner's invoice. * * *. Of the total sales of items from its rental fleet made by petitioner during its fiscal years ending 1976 and 1977, 18 of such "sales" were of items that were either lost, stolen from the job site, or damaged, and therefore "purchased" by the lessee pursuant to the above lease provision. These items included the following: Depreciation
Recapture &
Ordinary Income
Gain (or
Item of
Date
Date
Total
(or Loss) Not
Loss) in
Equipment
[4] Acquired "Sold"
Gain (Loss)
in Dispute
Dispute
One-ton Chain
Hoist
12/11/75
$193 $193
Bull Hose
9/4/75
746 $746 Aluminum Pick
1975
10/19/76
88 77
11 1-1/2 Ton
come-a-long
1974
12/8/76
136 36
100 Impact Wrench
1969
12/23/76
1,372 217
1,155 1-1/2 Ton
Come-a-long
1974
11/23/76
71 36
35 (2) Chain
Hoists
1973
2/16/77
482 426
56 (2) 20-Ton
Jacks
1969
5/6/7
115 71
44 Black & Decker
Hammer
1976
11/9/76
162 162
Black & Decker
Hammer
1968
11/9/76
385 122
263 300-amp
Electric
Welder
1973
6/1/76
(52)
(52)
(3) Aluminum
Picks
1975
5/13/77
195 153
42 Air Nailer
1968
8/10/76
200 200
225-amp Gas
Welder
1973
7/1/76
186 186
*163 II "Category II Sales:" Old and/or Obsolete Equipment
Petitioner, as a lessor of specialized construction equipment has, over the years, acquired a reputation of providing only equipment which is maintained in top-quality working condition. This reputation is essential to petitioner's continued business success due to the expense, potential liability and loss of business reputation which would be caused by failure of petitioner's equipment on a job site. Moreover, it is equally important to petitioner's business success that the equipment in its rental fleet constitute technologically updated items which meet current safety standards established by governmental regulations. In order to assure that its equipment met the above standards, petitioner maintained a staff of service mechanics who reported on the condition of the equipment in its rental fleet. When *164 petitioner determined that an item of equipment in its rental fleet was no longer in top condition, or that an item of equipment was technologically obsolete or failed to conform to current regulatory requirements of safety, petitioner either disposed of the item by sale, or salvaged useable parts from such equipment to repair other items in its rental fleet. The period of time that the assets comprising petitioner's rental fleet remained useful as rental assets varied from two to nine years. This was because most of the equipment employed by petitioner in its fleet was used equipment when acquired by petitioner, and varied in quality at the time petitioner purchased the equipment. Additionally, some projects which petitioner's equipment lessees worked on subjected petitioner's equipment to relatively more wear than did other projects.
The sales of items of equipment which were no longer appropriate for petitioner's rental fleet due to their age, condition, or obsolescence were negotiated in an informal manner. Petitioner did not maintain a sales force, a showroom or other selling facilities for selling these items. Rather, petitioner often attempted to sell equipment which *165 it knew had become inappropriate for its rental fleet while it was out on lease, before the expiration of the lease term. These items had previously been used in petitioner's leasing business and were no longer desirable items for petitioner's rental fleet for one or more of the reasons stated above. Petitioner was able to encourage the lessee to purchase the items by allowing a liberal credit against the quoted sales price for a portion of the rents already paid by the lessee. Moreover, in this manner, petitioner was often able to rid itself of items which were no longer useful to its rental fleet at a profit without engaging in substantial sales activity or transportation expense back to petitioner's premises. Generally, when petitioner determined that an item of equipment, which was not currently out on lease, had reached the end of its useful rental life, petitioner sold the item directly from its warehouse. However, in two instances during the years in issue, in lieu of selling outright equipment which had reached the end of its useful rental life, petitioner entered into modified "lease" agreements which ultimately resulted in sales. One item was leased to one of *166 petitioner's customers under a "modified rental agreement." This rental agreement granted the lessee an option to purchase the property for a specified purchase price with 80 percent of the rent paid by the lessee to be applied to reduce the purchase price, which option the lessee exercised. The option to purchase was granted by petitioner in this instance because petitioner considered the item of equipment to be already beyond its useful rental life and wanted to encourage the lessee to purchase the item. The other item was "leased" to one of petitioner's customers pursuant to a "rental-purchase" agreement. Pursuant to this agreement, ownership of this item was transferred to the "lessee" after it made 10 monthly "rental payments." The following schedule shows those items sold because they were no longer useful to petitioner's rental fleet. Depreciation
Recapture or Other
Total
Ordinary Income
Gain (or
Date
Date
Gain
(or Loss)
Loss) in
[5] Item of Equipment Acquired
Sold
(Loss)
Not in Dispute
Dispute
2,000 lb. Air
Tugger *
11/18/75
$1,198 $98
$1,100 Wacker Compactor +
9/25/75
489 39
450 (2) 50 hp. Pumps *
10/29/75
274 224
50 8-pack Welders *
3/3/76
311 311
Diesel Generator *
1970
9/3/75
7,074 224
6,850 Air Spider *
9/10/75
746 746 (2) Air Spiders +
6/4/75
1,180 280
828 Air Spider +
7/1/75
828 464
364 Gas Welder +
1970
1976
384 384
Air Compressor +
1969
1/13/76
929 79
850 Mast Section +
4/19/76
746 746 Air Tugger +
1974
2/10/77
2,955 255
2,700 Air Tugger +
1975
2/10/77
2,055 255
1,800 225-amp Welder o
1973
1/3/77
1,366 1,038
328 8-pack Welder #
1973
6/11/76
(1,051)
(1,051)
Electric Air
Compressor *
1968
6/4/76
1,642 1,642
(2) Electric
Welders *
1970
7/12/76
63 63
Air Tugger *
1975
2/1/77
923 363
560 Air Tugger *
1975
2/1/77
674 264
410 Air Tugger *
1974
2/17/77
3,032 255
2,777 (4) Sheaves &
Blocks *
1976
5/20/77
69 69
Spider Staging *
1975
2/1/77
403 379
24 Impact Wrench *
1975
4/13/77
769 174
595 Air Hammer *
1969
8/30/76
395 82
313 Jack *
1970
9/15/76
92 92
Wrench Tester *
1968
1/20/77
478 123
355 (2) Wacker
Compactors *
1969
1/7/77
3,183 83
3,100 (3) Impact
Wrenches *
1968
1/17/77
865 157
708 Heater *
1970
3/10/77
273 118
155 Impact Wrench *
1968
4/11/77
462 82
380 Grinder +
1969
9/1/76
70 70
Gas Welder +
1974
1/3/77
664 664
(2) Heaters +
1970
2/10/77
257 157
100 Chain Hoists +
1967
3/28/77
329 204
125 Impact Wrench +
1975
4/13/77
1,629 174
1,455 Wrench Tester &
(4) Jacks +
1969
5/6/77
240 112
128 Mortar Mixer +
1968
8/16/76
135 135
10-Ton Trolley +
1973
10/6/76
304 304
Single-Drum Hoist +
1969
11/2/76
1,780 780
1,000 Two-Drum Hoist +
1975
12/13/76
931 767
164 Cut-Off Saw +
1975
5/6/77
1,049 544
505 *167 III "Category III Sales:" Business Exigencies
As noted above, it was petitioner's policy to resist selling items of its equipment which remained in good rental condition. However, during the years in issue, circumstances arose which required petitioner to sell certain items of equipment whose useful rental life had not yet expired, and which were not lost or damaged by the lessee. The relevant facts relating to these sales are set out in the following subparagraphs. A. The Babcock and Wilcox Sales
During the years in issue, Babcock and Wilcox Company (hereinafter "B&W") was petitioner's largest rental customer. Beginning in 1972, B&W instituted a company policy *168 that, in general, any agreement it entered into with any of its construction equipment lessors must contain an option for B&W to purchase the leased assets. When B&W notified petitioner of its newly established policy, petitioner resisted granting options for B&W to purchase its equipment. However, officials of B&W informed petitioner that unless options to purchase were forthcoming, B&W would no longer conduct business with petitioner. Moreover, these officials represented to petitioner that the options to purchase were merely formalities and that said options would probably not be exercised by B&W. The prospect of losing its largest leasing customer, along with representations by certain officials of B&W that any options petitioner granted would probably not be exercised, convinced petitioner to grant B&W the required options to purchase its rental equipment. Accordingly, beginning in 1972, and continuing through the years in issue, petitioner granted B&W options to purchase its rental equipment whenever B&W so required. From 1972 through 1975, petitioner leased approximately 50 items to B&W with purchase options and only one of these options was exercised. In the summer *169 of 1976, however, (i.e., during petitioner's 1977 fiscal year), B&W exercised substantially all of the options held by it on petitioner's equipment which was then under lease to B&W. In light of B&W's prior representation that the options to purchase granted by petitioner would probably not be exercised, petitioner considered B&W's actions in the summer of 1976 to constitute a breach of faith. Petitioner's business with B&W was substantially diminished in subsequent years.
The following items were sold by petitioner to B&W as the result of B&W's exercise of options to purchase: Depreciation
Recapture or Other
Ordinary Income
Gain (or
Date
Date
Total
(or Loss)
Loss) in
Item of Equipment
Acquired
sold
Gain
Not in Dispute
Dispute
5,000 lb. Hoist
(1/2 interest)
1976
7/9/76
$20,053 $1,775 $18,278 5,000 lb. Hoist
(1/2 interest)
1974
7/9/76
15,020 1,775 13,245 Swing Cab Crane
1975
7/9/76
30,813 24,584 6,229 5,000 lb. Hoist
1974
7/9/76
(2,518)
(2,518)
5,000 lb. Hoist
1975
7/9/76
(16,595)
(16,595)
2,000 lb. Hoist
1975
7/9/76
(11,142)
(11,142)
(2) Air Tuggers
1975
7/9/76
14,621 14,621 5,000 lb. Hoist
1976
8/21/76
25,520 25,520 *170 B. The 100-ft. Stiff-leg Derrick and Hoist
Daniel Construction Company (hereinafter "Daniel") was a developing leasing customer of petitioner's during the years in issue. During its 1977 fiscal year, petitioner had its largest item of rental equipment -- a 100-ft. Stiff-leg derrick and hoist -- on lease to Daniel. Petitioner had acquired this asset in June 1972. Although Daniel had, on two occasions, previously requested petitioner to grant Daniel options to purchase this equipment, petitioner had refused since this item was, in petitioner's view, a fundamental part of its rental fleet and since it was against petitioner's policy to grant options on items needed for its rental fleet. This item was leased to Daniel pursuant to the terms of petitioner's standard rental agreement. However, during petitioner's fiscal year 1977, Daniel anticipated that it would need the 100-ft. stiff-leg derrick for at least seven more years and determined that it was not economical to lease this large item of equipment for such an extended period. Accordingly, in August 1976, Daniel demanded that petitioner sell this item and threatened to discontine doing business with petitioner if petitioner *171 refused. Since Daniel was a potentially valuable customer, petitioner did not want to lose its patronage, and petitioner therefore acceded to Daniel's demand and reluctantly sold this item to Daniel during its fiscal year 1977. Petitioner realized a gain on this sale of $134,611 and reported $53,620 of this amount as ordinary income under section 1245. The gain from this sale which remains in dispute is therefore $80,991. C. The 200-Ton Guy Derrick and Hoist
In 1972, petitioner purchased a 200-ton guy derrick and hoist. This derrick and hoist is an extremely large item and petitioner did not have adequate space at its Ohio equipment yard to shore it. However, petitioner was able to purchase this item because at the time of purchase petitioner and the seller agreed that petitioner could store the equipment in the seller's staging area in California at no charge until petitioner was able to lease it.
Two years after the guy derrick was purchased, petitioner was able to lease it to a customer for about 14 months. At the end of this 14-month lease term, the lessee returned the guy derrick to petitioner in Ohio. The item took up nearly all of the storage space in petitioner's *172 Ohio equipment yard, and petitioner was therefore anxious to dispose of it, preferably through lease. However, petitioner was unable to find a lessee. Sometime later, Drummond Coal Corporation, (hereinafter "Drummond") contacted petitioner wanting to purchase the guy derrick and hoist. Although petitioner would have preferred to lease the equipment, and indeed made two efforts to do so to Drummond, that company was not interested in leasing and would only purchase this item. Under these circumstances, petitioner determined that its only alternative was to sell the item to Drummond because it needed the storage space in its equipment yard for other items in its fleet, and accordingly sold it during its fiscal year ending 1977. Petitioner realized a total gain of $138,327 on the sale of this item, reported $8,977 of this gain as ordinary income recapture under section 1245 and reported $129,350 as long-term capital gain. Thus, the gain remaining in dispute from this sale is $129,350. IV Category IV Sales: Miscellaneous Sales
The assets falling within this category cannot be appropriately classified in any of the previous categories. None of these assets were lost or damaged *173 by a lessee. Additionally, these assets were either never actually used in petitioner's rental fleet or, if they were, were sold prior to the expiration of their useful rental lives. They are thus not properly classified as Category II assets. Moreover, these assets were not sold upon threat of the purchaser to discontinue leasing business with petitioner or as the result of other compelling business exigencies and therefore cannot be placed in Category III. The peculiar facts relating to these sales are set out in the following subparagraphs. A. 2 Wacker Compactors
In petitioner's fiscal year ending 1977, Newton Associates, one of petitioner's very good customers, contacted petitioner and informed petitioner that they wished to lease four Wacker compactors. However, petitioner had only two such items available. In order to accommodate this customer, petitioner itself rented two Wacker compactors from another equipment lessor and then rented these items, together with petitioner's own compactors, to Newton Associates for a four-month period. During the rental period, Newton Associates requested to purchase all four of these compactors. Since petitioner had determined *174 that the two compactors which it owned had reached the end of their useful rental lives, it was anxious to make this sale. (See Category II Sales, supra). Therefore, petitioner purchased the two items it had previously rented from the other equipment lessor and sold them to Newton Associates. Petitioner realized and reported a short-term capital gain (i.e., ordinary income) of $845 on this sale. Thus, petitioner reported no amount of this gain as long-term capital gain. B. Two Ten-Ton Trolleys
In 1976, Cherne Contracting Company (hereinafter "Cherne") one of petitioner's valued leasing customers, approached petitioner wanting to rent two ten-ton trolleys.At the time of this request, petitioner did not have any such items which would conform to Cherne's specifications. Petitioner had found, through experience, that items such as these were not frequently requested for rental and therefore was reluctant to purchase such items for its fleet.Nevertheless, since Cherne was one of petitioner's valued customers, petitioner purchased two ten-ton trolleys for lease to Cherne as an accommodation. During the lease term, Cherne expressed an interest in purchasing these items. *175 Since petitioner never really wanted these items for its rental fleet in the first place, it sold them to Cherne at its request on January 1, 1977, for a total sales price of $1,349. Petitioner realized a gain of $460 on these sales, all of which was reported as short-term capital gain (i.e., ordinary income). Thus, no gain arising from these sales remains in dispute herein. C. Stiff-Leg Derrick and 2 Derricks
Petitioner purchased a one-half interest in the stiff-leg derrick in 1975 and purchased the two other derricks outright in 1972. Petitioner acquired its interest in these items through a Mr. Waterman of Waterman Supply Company upon his recommendation that such items might be useful to petitioner in its leasing business. These items were purchased by petitioner sight unseen. When petitioner inspected these items, it found that they were not of sufficiently good quality to be included in its rental fleet and therefore sold them during its fiscal year ending 1977. The stiff-leg derrick was sold on June 18, 1976, for a total sales price of $4,530.Petitioner realized a gain of $1,376 on this sale and reported $906 as ordinary income pursuant to section 1245 and $470 *176 as long-term capital gain. Thus, the gain remaining in dispute with respect to this item is $470. The other two derricks were sold by petitioner on May 10, 1977, for a total sales price of $26,850. Petitioner realized a gain of $11,697 on this sale and reported $10,847 as ordinary income pursuant to section 1245. The gain remaining in dispute with respect to these items is therefore $850. D. Sales From Lot Purchases
As noted above, much of the equipment constituting petitioner's rental fleet was used equipment when it was acquired by petitioner. Some of this used equipment was acquired by petitioner at auctions in which public utilities, after completing the construction of a power plant, sold surplus equipment which had been used for the construction of the plant. The public utilities conducted these action sales by assembling equipment into lots, with each separate lot sometimes containing 50 or more separate pieces of equipment. Prospective purchasers would then be required to bid on each collected lot and could not bid on particular items in a lot. Moreover, prospective purchasers were not afforded an opportunity to closely inspect all of the equipment in a lot *177 prior to entering a bid. Petitioner was, at times, willing to purchase entire lots of equipment even under these unsatisfactory circumstances for two reasons. First, petitioner often found that the specialized types of equipment involved were difficult to acquire due to their scarcity. Second, due to the extensiveness of petitioner's rental business it expected that items in the lot could be used in this business either for rental purposes or as an inexpensive source of repair parts, and this generally proved to be the case. However, certain items infrequently proved adaptable for neither of the above purposes because of their character or condition. When petitioner discovered such items, it sold them. The following sales fall within this category: Depreciation or
Other Ordinary
Item Of
Date
Date
Total
Income Not
Gain In
Equipment
Acquired
Sold
Gain
In Dispute
Dispute
Two-Drum Hoist
1977
1977
3,300
3,300
Two-Drum Hoist
1977
1977
3,300
3,300
Aluminum Pick
1975
6/4/76
28
28
Aluminum Pick
1976
9/1/76
57
35
22
Aluminum Pick
1975
10/13/76
109
77
32
V Conceded Items
*178 Petitioner has conceded that gain from the sale of certain items of its equipment which it reported as capital gain for the years in issue should have been reported as ordinary income. The facts relating to these sales are nevertheless relevant in determining the overall character of petitioner's business and are therefore included herein. A. 38 Aluminum Picks
Iowa Public Service Company (hereinafter "Iowa"), one of petitioner's leasing customers, wanted to purchase aluminum picks [6] new. However, for unexplained reasons, Iowa was not able to purchase these items from their manufacturer.It was, however, able to rent this equipment and purchase it thereafter when the equipment was used. [6]
In order to accommodate Iowa, petitioner agreed to purchase these picks new, "rent" them to Iowa for a short period of time, and then sell them to Iowa at the end of the "lease" term. Thus, petitioner purchased these items, entered into short-term (four months or less) "lease" agreements with Iowa, and pursuant to the terms of these *179 agreements Iowa was granted an option to purchase these items at specified prices with 80 percent (with respect to 36 of the picks) or 85 percent (with respect to two of the picks) of the "rental" payments to be applied to reduce the purchase price. These options were exercised by Iowa during petitioner's fiscal year ending 1976. B. 3 Portable Air Compressors
These items were leased by petitioner to a company called Haven Bush. Although the equipment had not reached the end of its useful rental life, petitioner granted Haven Bush options to purchase these items under the lease. These options were granted at the insistence of Haven Bush. Pursuant to the terms of the lease, Haven Bush was entitled to purchase these items for specified amounts with 85 percent of the rent paid to be applied against the purchase price. It was highly unusual for petitioner to grant options under these circumstances. Haven Bush exercised these options during petitioner's fiscal year ending 1976. Petitioner now concedes that the gains it reported from the sales of items in subparagraphs A and B immediately above should be treated as ordinary income. The total amount reported by petitioner *180 as long-term capital gain from these sales for its fiscal year ending 1976 was $11,435. C. Four Electric Spiders; Eight 2-man Spiders; Three 4,000 1b. Double Drum Hoists
These items were purchased new by petitioner at the specific request of Union Boiler Company, (hereinafter "union") one of petitioner's customers, for immediate "rental" to Union. Although petitioner already had these items of equipment in its rental fleet, Union, for business reasons, was unwilling to lease used equipment. To accommodate Union, petitioner purchased these items and, since it did not need these duplicate items in its rental fleet, petitioner immediately "rented" this equipment to Union under an agreement whereby the ownership of this equipment would pass to Union upon its making ten consecutive monthly payments to petitioner. During petitioner's fiscal year ending 1977, the ten monthly payments with respect to these items were completed and ownership was therefore transferred by petitioner to Union. Petitioner reported $18,350 of the gain from these transactions as long-term capital gain but now concedes said gain should have been reported as ordinary income. * * * In the statutory *181 notice of deficiency, respondent determined that all of the gain from sales of assets from petitioner's rental fleet which was reported by petitioner as long-term capital gain should have been reported as ordinary income. This determination was based upon respondent's conclusion that all of the property comprising petitioner's rental fleet was held by petitioner primarily for sale to customers in the ordinary course of its trade or business. OPINION The sole issue in this case is whether the gain realized by petitioner from the sale of various items of equipment during its fiscal years ending May 31, 1976, and May 31, 1977, should be treated as ordinary income or capital gain. The parties agree that the assets here concerned did not qualify as "capital assets" under section 1221 because they were depreciable assets used in petitioner's trade or business. [7] The resolution of the issue in dispute herein depends upon whether the gain from the sale of petitioner's assets can be considered capital gain under the provisions of section 1231. *182 Section 1231(a) generally provides that net gains from the sale and involuntary conversion of "property used in a trade or business" shall be treated as capital gains, [8] even though said property does not qualify as "capital assets" under section 1221. For purposes of section 1231, "property used in a trade or business" is defined in section 1231(b) which, as applicable to the years in issue, provided in pertinent part: (b) Definition of Property Used in the Trade or Business.--For purposes of this section-- (1) General rule.--The term "property used in the trade or business" means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 167, held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not-- * * * (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, * * * Respondent does not dispute that the assets petitioner reported as having generated long-term capital gain were held by petitioner for the requisite six-month holding period. [9] Respondent does contend, however, *183 that petitioner held these assets "primarily for sale to customers in the ordinary course of his business" within the meaning of section 1231(b)(1)(B), and therefore maintains that all of the gain in dispute should be treated as ordinary income. [10]
*184 Petitioner, on the other hand, argues that, except for certain conceded items, its equipment was held primarily for lease and not for sale to customers in the ordinary course of its trade or business. Petitioner therefore contends that it is entitled to favorable capital gains treatment with respecr to all of the gain remaining in dispute pursuant to the general allowance of section 1231(a). Whether property is held by a taxpayer "primarily for sale to customers in the ordinary course of business" is purely a factual question, S & H, Inc. v. Commissioner,78 T.C. 234 (1982); Byram v. United States,705 F.2d 1418 (5th Cir. 1983), and petitioner bears the burden of proving that its property was not so held. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Moreover, the Supreme Court has clearly stated that when making this factual determination, the word "primarily" is to be afforded its ordinary, everyday meaning of "principally" or "of first importance." [11]Malat v. Riddell,383 U.S. 569, 572 (1966). [12] This literal construction of the statute is consistent with the purpose of the capital gains provisions *185 which, is stated by the Supreme Court, were intended to: * * * differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand ( Corn Products [Refining] Co. v. Commissioner,350 U.S. 46, 52) and "the realization of appreciation in value accrued over a substantial period of time" on the other. ( Commissioner v. Gillette Motor [Transport] Co.,364 U.S. 130, 134). [Malat v. Riddell,supra at 572] See also S & H, Inc. v. Commissioner,supra;McManus v. Commissioner,65 T.C. 197 (1975), affd. 583 F.2d 443 (9th Cir. 1978), cert. denied 440 U.S. 959. *186 Thus, unless petitioner held the property here in issue principally for sale in the ordinary course of business, said property will not be excluded from the category of property to be afforded capital gain treatment under section 1231(a) because of section 1231(b)(1)(B). Once this black-letter rule is stated, however, it must be tempered by an acknowledgment that each individual case in this area of the law must be considered and evaluated on its peculiar and particular facts. Compare R. E. Moorhead & Son, Inc. v. Commissioner,40 T.C. 704 (1963) and Latimer-Looney Chevrolet, Inc. v. Commissioner,19 T.C. 120 (1952). The particular facts presented in this case make resolution of the disputed issue especially difficult. Petitioner's leasing business was an ongoing enterprise which required that sales be made on a rather frequent and recurring basis as petitioner's equipment was lost or damaged by the lessee or as such equipment became obsolete or otherwise useless to petitioner's rental business (Category I and II Sales). Additionally, certain business exigencies dictated that petitioner sell certain items of equipment that had not yet reached *187 the end of their useful rental lives during the years in issue (Category III Sales). Moreover, petitioner sold certain other items which cannot fairly be placed in the above categories (Category IV Sales). Finally, the gains derived from the sales in question, although not the primary source of petitioner's business income during the years in issue, were not insubstantial. As a threshold matter, it is important to point out that petitioner does not contend that it did not hold any assets primarily for sale in the ordinary course of business. It is apparent from the record that any such contention would be completely without merit. Petitioner's income tax returns disclose that it carried certain assets in inventory and it is therefore clear that petitioner conducted a sales as well as a leasing business. Petitioner acknowledged such on its returns when it listed its business activities as "sales, servicing and leasing construction equipment." Moreover, petitioner has conceded that certain items of equipment which it originally characterized as section 1231 assets were, in fact, held by petitioner primarily for sale to customers in the ordinary course of its business. Petitioner *188 admitted on brief that these conceded items "did not constitute items that were acquired by petitioner and held by petitioner in its equipment rental fleet," and should therefore have been placed in its sales inventory from the outset. The fact that petitioner held an inventory of assets for sale in the ordinary course of business does not, however, end the inquiry, for a taxpayer may hold some assets for sale and other similar assets for use in its trade or business. See Latimer-Looney Chevrolet, Inc. v. Commissioner,supra;A. Benetti Novelty Co. v. Commissioner,13 T.C. 1072 (1949). [13] Petitioner argues such is the case here, and that the assets we have found as comprising petitioner's rental fleet were acquired and held by petitioner primarily for rental, and not for sale. The sales of its rental equipment, petitioner says, were merely necessary incidents to the conduct of its rental business and not petitioner's predominant motive in acquiring and holding these assets. Implicit in this contention is that the rental business was separate, and independent of the sales of inventory items. *189 Respondent does not quarrel with the implicit premise in petitioner's position that petitioner operated a substantial rental business independently of its sales of inventory items. Respondent would, however, characterize petitioner's rental business, and, by necessary inference, the purpose for which petitioner held the assets used in that business, quite differently than would petitioner. Pointing to the facts outlined above, respondent contends that the record demonstrates that petitioner did not just operate a rental business with respect to the assets in its rental fleet. Rather, respondent maintains that petitioner operated both a rental and sale business with respect to such assets and that petitioner held such assets for the dual purpose of rental and sale. As such, respondent argues that these assets should be deemed to have been held by petitioner primarily for sale to customers in the ordinary course of its trade or business. Respondent relies principally upon the analysis contained in International Shoe Machine Corp. v. United States,491 F.2d 157 (1st Cir. 1974), cert. denied 419 U.S. 834. We cannot agree with respondent's analysis *190 of the facts, nor with the legal conclusions he would have us draw therefrom. In determining whether the section 1231(b)(1)(B) exclusion from capital gains treatment is met, the purpose for which the property is held is the controlling factor. S.O. Bynum v. Commissioner,supra;Kirk v. Commissioner,47 T.C. 177 (1966); McCullough Transfer Company v. Commissioner,27 T.C. 822 (1957); A. Benetti Novelty Co. v. Commissioner,supra;Latimer-Looney Chevrolet, Inc. v. Commissioner,supra.The fact that assets are ultimately disposed of by sale is not necessarily decisive of this question. See, e.g., Hillard v. Commissioner,281 F.2d 279 (5th Cir. 1960); Philber Equipment Corp. v. Commissioner,237 F.2d 129 (3th Cir. 1956); McCullough Transfer Company v. Commissioner,supra;Kirk v. Commissioner,supra.Cf. Grant Oil Tool Co v. United States,180 Ct. Cl. 620, 381 F.2d 389 (1967). Rather, the taxpayer's intent in acquiring the property, his reason for holding the property, the relationship of the property *191 to petitioner's trade or business and the extent of its use must be examined and weighed. We think respondent, by focusing on the mere fact that petitioner sold equipment from its rental fleet which generated income to petitioner that was not insubstantial, when compared to its leasing receipts, fails to paint a complete picture and thereby misconstrues the essence of petitioner's leasing business. Petitioner has presented credible, unrefuted evidence that all of the assets comprising its rental fleet were acquired for the specific purpose of rental, and that it was petitioner's established policy not to sell rental items as long as they remained in rentable condition. Moreover, the record clearly shows that except with respect to a certain few assets (discussed infra), petitioner's original purpose in acquiring these assets was never departed from. The facts surrounding the various sales in issue demonstrate that such sales were not inconsistent with petitioner's conduct of a rental business. To the contrary, petitioner's acquisition, use and even its ultimate disposition of the equipment in issue (again, except with respect to certain assets discussed infra) had as their *192 primary purpose the operation of a rental, and not a sale business. Initially, we find respondent's attempt to derive support for his contention that petitioner held the assets comprising its rental fleet primarily for sale, or for the dual purpose of rental and sale, from the facts of the sales denominated as Category I sales in our findings, to be unwarranted. Because of the nature of the projects on which petitioner's rental equipment was used, petitioner expected that certain of its assets would be lost or damaged by the lessee and petitioner therefore had an established policy which required the lessee to reimburse petitioner for such items. However, these "sales" [14] were, from the perspective of petitioner, unwanted and unavoidable occurrences over which petitioner exercised no control. Such sales certainly cannot be taken as evidence that petitioner held all of its rental fleet assets primarily for sale, or even for the dual purpose of sale and rent. *193 Moreover, the sales falling within this category, and the gains generated therefrom, were relatively insignificant when compared to petitioner's leasing activity. Petitioner sold only two items of its equipment during its fiscal year ending May 31, 1976, as the result of the loss or destruction by the lessee.Only 13 sales falling within this category were made during petitioner's fiscal year ending May 31, 1977. Only $746 of the gain in issue in this case for petitioner's fiscal year ending May 31, 1976, is attributable to these transactions, while only $1,706 of the gain in issue for petitioner's fiscal year ending May 31, 1977, is attributable to said transactions. The Category I sales were thus clearly not, in and of themselves, "of first importance" to petitioner's business. Malat v. Riddell,supra.Cf. Grant Oil Tool Co. v. United States,supra.
Secondly, the vast numerical majority of sales from petitioner's rental fleet which occurred during the years in issue were sales which we have classified as Category II sales in our findings. These sales were of items which we have found had, prior to sale, been used by petitioner extensively *194 for rental purposes, or otherwise utilized in petitioner's rental fleet. Respondent refers us to these sales and reminds us that frequency, continuity, and substantiality of sales are often taken as evidence that a particular taxpayer holds property primarily for the purpose of sale. Respondent additionally argues that the method petitioner utilized to effectuate these sales belies petitioner's contention that these items had ceased to be useful to petitioner's rental fleet at the time they were sold. More precisely, respondent points out that may of the items falling within this category were sold while out on lease to the then-current lessee, and questions how petitioner can argue that such items had reached the end of their useful rental lives when sold under such circumstances. Once again, respondent glosses over the totality of facts. Petitioner has established that its leasing business success was largely a function of its having established a reputation of providing to its customers only equipment which was in first-class working condition. In order to assure that this standard was met by items in its rental fleet, it was often necessary for petitioner to dispose of items *195 before they were reduced to scrap value. Moreover, since petitioner often purchased used equipment for its rental fleet, the useful life of such equipment to the fleet was, at times, relatively short.These facts do not lead to a necessary inference that petitioner's principal purpose in acquiring and holding these assets was for sale. See Hillard v. Commissioner,supra;Philber Equipment Corp. v. Commissioner, supra;Latimer-Looney Chevrolet, Inc. v. Commissioner,supra.
Petitioner has established through unrefuted testimony, which we found credible, as well as by documentary evidence, that each item we have placed within this category was used in its rental fleet prior to sale and, when sold, was no longer of a quality or character which could continue to be used in the fleet. The fact that petitioner often used current lessees as outlets for many of its obsolete items does not lead us to question the credibility of this unrefuted testimony, but to the contrary buttresses petitioner's assertion that it did not hold the assets falling within this category with the final gains from their sales as a determining business purpose. *196 Had this been petitioner's goal, it presumably would have utilized a well-organized sales force as well as more sophisticated marketing techniques. See Philber Equipment Corp. v. Commissioner, supra.Additionally, it is important that petitioner's rental fleet continually expanded in size despite the existence of these sales. On June 1, 1975, petitioner's rental fleet consisted of approximately 324 items and by July 31, 1977, consisted of 375 items. Thus petitioner was continually reinvesting the proceeds of these sales in an effort to maintain and augment an up-to-date fleet. On these facts, we conclude that the assets falling within Category II were held by petitioner primarily for use in its rental business and not for sale. Sales of worn-out or obsolete items were simply the natural conclusion of the equipment rental cycle, and not the primary purpose for petitioner holding these items. See Hillard v. Commissioner,supra;Philber Equipment Corp. v. Commissioner,supra. Cf. Kirk v. Commissioner,supra;Latimer-Looney Chevrolet, Inc. v. Commissioner,supra.
Respondent continues *197 to protest that other evidence of record demonstrates that petitioner's primary purpose in holding all the assets comprising its rental fleet was for sale. In particular, respondent points to certain sales (denominated as Category III sales in our findings), which were neither dispositions of old or obsolete items, nor the result of the loss or destruction of petitioner's rental equipment by the lessee. Most of these sales were of items with respect to which petitioner had granted options to purchase. From these facts, respondent would have us conclude that petitioner held not only these particular assets, but all of the assets in its rental fleet for the primary purpose of sale. Once again, respondent does not present a complete picture. When the facts surrounding the Category III sales are examined, it becomes clear that any inference that petitioner held these and all other assets in its rental fleet primarily for sale would be unwarranted extrapolation. In the first place, sales of this type were infrequent, nonrecurring transactions. Petitioner sold no assets falling within this category during its fiscal year 1976. Only 11 such sales occurred during petitioner's fiscal *198 year 1977. Prior to petitioner's selling these assets, they were used as rental items. More importantly, all but one of the sales falling within this category were made, or options to purchase which resulted in these sales were granted, under threat of one of petitioner's valued rental customers to discontinue business if petitioner refused. Indeed, in each instance, the ultimate purchasers of these assets made previous requests to purchase (or for petitioner to grant options to purchase), unaccompanied by threat to discontinue their leasing business with petitioner, which petitioner refused.Moreover, the options to purchase which resulted in nine out of 11 of the sales falling within this category, were granted only after the lessee, Babcock and Wilcox, represented to petitioner that such options were merely formalities which would probably not be exercised. The sale by petitioner of the 200-ton guy derrick and hoist, although not made under threat by petitioner's customer to cease doing business with petitioner, was nonetheless precipitated by other compelling factors. Petitioner had no space to store this extremely large item of equipment and was therefore forced to dispose *199 of it promptly. In making a determination of the principal purpose for which property is held, the intent of the taxpayer is of prime importance and decisions of this nature simply cannot be made in vacuo. Although it is a mere truism to say that nobody sells without an intent to sell, this alone cannot be determinative of the purpose for which property is principally held. Philber Equipment Corp. v. Commissioner,supra;Hillard v. Commissioner,supra;McCullough Transfer Company v. Commissioner,supra;Kirk v. Commissioner,supra. Holding property primarily for the purpose of sale implies a reasonably free choice to sell, combined with substantial selling activities. While exigencies of business sometimes require one to turn to some extent to selling certain assets, it is the nature of the impetus to sell, [15] as well as the degree of sale activities which are relevant in resolving the present issue. *200 As the facts summarized above suggest, petitioner's sales of Category III assets were not precipitated by any generalized intent of petitioner to change the purpose for which these assets were acquired (i.e., for lease). Rather, these sales represented an unwilling abandonment of petitioner's objective to realize rental income from these items dictated by the necessities of the circumstances. As we view it, petitioner was thus compelled to liquidate its investment in these assets. Moreover, since petitioner succumbed to this outside pressure only infrequently, we find respondent's attempt to attribute to petitioner the general purpose to sell all assets in its rental fleet a case of stretching the argument farther than it will reach. Petitioner acquired the assets in its fleet solely for the purpose of lease and not for sale. With respect to the assets we have denominated as Category I, II and III assets, petitioner's original purpose in acquiring these assets was to hold them until such assets were rendered useless for rental purposes due to their age or obsolescence. It would, of course, be the height of naivate to assume that petitioner, a company in the business of renting *201 specialized construction equipment, did not realize that at some point it would be required to sell some of the assets comprising its fleet. The recognition of this possibility by petitioner was, however, not the primary purpose for petitioner's holding these assets. Accordingly, we have found that the assets denominated as Category I, II and III assets in our findings were not held by petitioner primarily for sale to customers in the ordinary course of business and, with respect to the gain generated by the sales of these assets and reported by petitioner as long-term capital gain or loss, we hold for petitioner. Respondent's reliance upon holdings of such cases as International Shoe Machine Corp. v. United States,supra and Recordak Corporation v. United States,163 Ct. Cl. 294, 325 F.2d 460 (1963), is misplaced. These cases address factual situations where a taxpayer holds all of its property for the dual purpose of both rental and sale and the conclusions reached in these cases are premised upon such a finding of dual purpose. Thus, in International Shoe Machine Corp. v. United States,supra, District Court specifically *202 found: When customers expressed an interest in purchasing the machine that they were leasing, plaintiff did not simply say, "We do not sell our machines." * * * Plaintiff adopted a policy of selling * * *. The policy was simply to sell if the customer insisted on buying, despite company's preferences. The customer did not have to threaten to sue plaintiff or to take his business elsewhere unless plaintiff sold. [369 F. Supp. 588 at 591 (D. Mass. 1973)]. In Recordak Corporation v. United States,supra, the Court of Claims specifically found that the taxpayer held all of its property for sale or rent, whichever the customer preferred. The Court, in distinguishing certain rental-obsolescence cases, stated: These were automobile and truck rental cases in which the courts held or assumed that the taxpayers' business was the rental business and not the dual business of both selling and renting to customers. Recordak does not fall within that class: all of its equipment was available for sale or rental to its customers * * *. [325 F.2d at 463] Where a taxpayer holds property for the dual purpose of rental or sale, the above *203 cases recognized that it would be contrary to the legislative purpose underlying the capital gains provisions to allow capital gain treatment when the assets are sold. That is not the case here, however.Petitioner acquired the assets comprising its rental fleet for the primary purpose of lease. With respect to assets we have denominated as Category I, II and III assets, this purpose was not departed from by petitioner. The sales of such assets were merely necessary incidents to petitioner's rental business. Accordingly, we reject respondent's attempt to draw support from this line of cases. On category of assets remains to be considered -- those assets we have denominated in our findings as Category IV sales. For the reasons stated hereinafter, we find that these assets were held by petitioner primarily for sale to customers in the ordinary course of its trade or business within the intendment of section 1231(b)(1)(B). Initially, it appears that two Wacker compactors and the two ten-ton trolleys, denominated in our findings as paragraphs IV A and B, respectively, were acquired by petitioner for the primary purpose of sale, like the items petitioner has conceded should have *204 been included by petitioner in its inventory rather than its rental fleet. However, since these items generated none of the gain in dispute, they need not be considered further. With respect to the remaining assets falling within this category, petitioner purchased these assets intending to use them in its rental fleet. However, petitioner was unable to inspect these assets prior to acquiring them. After it did inspect these assets, petitioner found that, because of their character, they were not useable as rental items, and therefore, sought to dispose of them by sale. These assets were thus never employed by petitioner for use in its rental fleet. It is clear that although petitioner did not acquire these assets with intent to sell them, petitioner's purpose in holding these assets was altered and subsumed by its desire to sell when it became clear that they could not be used and were not used, in petitioner's rental fleet. Unlike the assets we have denominated as Category I, II and III assets in our findings, petitioner did not intend to hold these assets for rental use over their reasonably determinable lives. Contrast Moorhead & Son, Inc. v. Commissioner,supra, *205 with Latimer-Looney Chevrolet, Inc. v. Commissioner,supra.These assets must therefore be deemed to have been held by petitioner primarily for sale in the ordinary course of its trade or business. [16] With respect to the gain generated by the sale of these assets, which was reported by petitioner as long-term capital gain, we therefore hold for respondent. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references herein are to sections of the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All references to Rules are to the Tax Court Rules of Practice and Procedure.↩
2. It is apparent from the record that, in addition to conducting a leasing business, petitioner also conducted a sales business to some extent.Petitioner's fiscal 1976 and 1977 Federal income tax returns disclose that petitioner held certain assets in inventory and these items presumably were items of construction equipment since petitioner listed its business activity as "sales, servicing and leasing construction equipment" on both its fiscal 1976 and 1977 returns. Additionally, petitioner's concessions with respect to certain items of equipment, was to the effect that these items were mistakenly placed by petitioner in its rental fleet on its books and should instead have been treated as inventory items. Respondent does not suggest, however, that the assets referred to herein as comprising petitioner's "rental fleet" or "fleet" were, when acquired, properly includable by petitioner in its inventory. In fact, the parties have stipulated that such assets were depreciable assets, which is inconsistent with such a proposition. See sec. 1.167(a)-2, Income Tax Regs.↩ It is therefore apparent that petitioner's sale of inventory items and its conduct of its leasing business were independent aspects of petitioner's overall enterprise, and assets referred to herein as comprising petitioner's "rental fleet" or "fleet" include only those assets acquired by petitioner for the specific purpose of use in the conduct of its leasing activities.
3. The precise percentage of the amounts reported by petitioner as gross receipts which constituted receipts from petitioner's leasing activities is not clearly disclosed in the record. As noted in footnote 2, supra,↩ petitioner also derived gross receipts from the sale of certain nondepreciable assets from inventory, and it is not disclosed what portion of petitioner's overall gross receipts was made up of receipts from the sales of these items. However, petitioner's tax returns disclosed that its total cost basis in its inventory items during its fiscal years ending 1976 and 1977 were $202,053 and $112,356, respectively, including beginning inventory plus merchandise purchased for sale during the year.Petitioner's ending inventories for its fiscal years ending 1976 and 1977 were reported as $26,153 and $30,243, respectively. Thus, even assuming petitioner placed a large markup on its inventory items, ite gross receipts from its leasing activities are nonetheless properly characterized as substantial.
4. Some of the dates petitioner acquired its numerous rental assets is not disclosed in the record. We note, however, that respondent does not contend that petitioner failed to meet the holding period requirement of sec. 1231 with respect to any asset reported by petitioner as generating long-term capital gain.↩
5. The following explanatory symbols are used: Those items marked with an asterisk "*" were items that were sold while on lease under petitioner's standard rental agreement; those items marked with a "+" were items which were sold from petitioner's warehouse when they were under no lease agreement; the item marked with a "#" is the item that was sold pursuant to the "rental purchase agreement," and; the item marked with an "o" is the item that was purchased pursuant to an option granted by petitioner.↩
6. "Picks" is apparently a term of art in petitioner's industry. The layman's description would be scaffolding and catwalks or movable platforms.↩
7. This type of asset is specifically excluded from capital asset characterization by sec. 1221 which provides in relevant part: SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer, * * * but does not include -- * * * (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167 * * *.↩
8. As in effect during the years in issue, sec. 1231(a) provided: (a) General Rule.--If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. For purposes of this subsection -- (1) in determining under this subsection whether gains exceed losses, the gains described therein shall be included only if and to the extent taken into account in computing gross income and the losses described therein shall be included only if and to the extent taken into account in computing taxable income, except that section 1211 shall not apply; and (2) losses (including losses not compensated for by insurance or otherwise) upon the destruction, in whole or in part, theft or seizure, or requisition or condemnation of (A) property used in the trade or business or (B) capital assets held for more than 6 months shall be considered losses from a compulsory or involuntary conversion. In the case of any involuntary conversion (subject to the provisions of this subsection but for this sentence) arising from fire, storm, shipwreck, or other casualty, or from theft, of any property used in the trade or business or of any capital asset held for more than 6 months, this subsection shall not apply to such conversion (whether resulting in gain or loss) if during the taxable year the recognized losses from such conversions exceed the recognized gains from such conversions. ↩
9. It is necessary to point out that certain assets referred to herein as comprising petitioner's rental fleet failed to meet the definitional requisites for section 1231 treatment since they were not held by petitioner for more than six months. However, petitioner did not include the gains or losses from the sale of asserts held for less than six months in the section 1231 netting process in arriving at its total long-term capital gains reported from sales of its depreciable assets. Rather, petitioner reported the gains and losses from the sale of these items as ordinary gain or loss, separately from its section 1231 net gains. Respondent does not contest the propriety of petitioner's treatment of these gains and losses. Any reference to such assets herein is solely for purposes of drawing a clear picture of petitioner's overall business activities, and should not be taken as an indication that the gain petitioner realized from these sales qualified for section 1231 treatment. ↩
10. Respondent's failure to contest the validity of depreciation claimed with respect to the assets in issue is not necessarily inconsistent with his primary contention herein. Although property that is subject to an allowance for depreciation cannot simultaneously be held primarily for sale in the ordinary course of business, (see sec. 1.167(a)-2, Income Tax Regs.↩), the exclusionary clause of sec. 1231(b)(1)(B) may apply to property that was formerly used in a trade or business, but was converted subsequently to being held primarily for sale.
11. In so holding, the Supreme Court specifically rejected a construction, urged upon the Court by the government, to the effect that a purpose may be "primary" if it is merely a substantial one. See Malat v. Riddell,383 U.S. 569, 571↩ (1966). 12. Although Malat v. Riddell,supra, concerned the issue of whether property was held primarily for sale to customers for purposes of sec. 1221(1), the identical phrase appears in sec. 1231(b)(1)(B). Moreover, the Supreme Court in Malat emphasized that "the words of statutes - including revenue acts - should be interpreted where possible in their ordinary, everyday senses." See Malat,supra at 571. Accordingly, it is clear that the word "primarily" in sec. 1231(b)(1)(B) must be afforded the same meaning that the Supreme Court afforded to that word in the context of sec. 1221(1). See Hollywood Baseball Association v. Commissioner,423 F.2d 494 (9th Cir. 1970), affg. 49 T.C. 338 (1968), cert. denied 400 U.S. 848; S & H Inc. v. Commissioner,78 T.C. 234 (1982); S.O. Bynum v. Commissioner,46 T.C. 295↩ (1966).
13. See also Browning et al. v. Commissioner,9 T.C.M. 1061↩ 19 P-H Memo T.C. par. 50,285 (1950).
14. Both of the parties treat the transactions falling within this category as sales. We note however that these transactions are more properly characterized as involuntary conversions rather than sales since petitioner simply charged its lessee for loss or damage to these assets. See Grant Oil Tool Co. v. United States,180 Ct. Cl. 620, 381 F.2d 389↩ (1967). In any event, the semantic distinction is uimportant in the context of this case. See sec. 1231(a).
15. See, e.g., Dawson v. Thomas, an unreported decision, 43 AFTR 1264, 51-1 USTC par. 9351 (N.D. Tex. 1951), where the Court held that a taxpayer that rented machines pursuant to contracts which contained options to purchase or recapture clauses, did not hold its equipment primarily for sale since the taxpayer's customer, the U.S. government, required those clauses. See also, Desilu Productions, Inc. v. Commissioner,T.C. Memo. 1965-307; S. P. McCall v. Commissioner,T.C. Memo. 1954-33↩.
16. It is clear that petitioner's ordinary course of business included sale of certain assets since petitioner carried an inventory of items specifically for sale.↩